## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | In Proceedings for a Reorganization |
| TRUSTEES OF CONNEAUT LAKE PARK, INC., | ) | Under Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | Case No. 14-11277-JAD |
| .........................................................) | | |

## SECOND AMENDED DISCLOSURE STATEMENT
## TO ACCOMPANY SECOND AMENDED PLAN DATED OCTOBER 16, 2015

Debtor[1] furnishes this disclosure statement to creditors in the above-captioned matter pursuant to Bankruptcy Code §1125 to assist them in evaluating Debtor's proposed amended Chapter 11 plan ("*Plan*"), a copy of which is attached hereto as Exhibit A.  Creditors may vote for or against the Plan.  Creditors who wish to vote must complete their ballots and return them to the following address before the deadline noted in the order approving the disclosure statement and fixing time.  The Court will schedule a hearing on the Plan pursuant to Bankruptcy Code §1129.

Address for return of ballots:

**Stonecipher Law Firm**
**125 First Avenue**
**Pittsburgh, PA 15222**
**Attn: George T. Snyder, Esquire**

*This Disclosure Statement does not purport to be a complete description of the Plan, a complete description of the financial data pertaining to the Debtor, a complete description of the applicable provisions of the Bankruptcy Code or a complete description of any other matters that may be deemed significant by certain Creditors.*

**NO INFORMATION CONCERNING THE DEBTOR IS AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS STATEMENT.   ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, WHO IN TURN SHALL DELIVER SUCH**

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in the Debtor's Plan of Reorganization.

**INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

**THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY AN ORDER OF THE BANKRUPTCY COURT AFTER NOTICE AND A HEARING.  THE COURT FOUND THAT THE INFORMATION CONTAINED HEREIN IS ADEQUATE PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.  HOWEVER, THE COURT HAS NOT PASSED UPON THE PLAN, NOR ARE THE DISCLOSURE STATEMENT AND ORDER AFFIRMING SAME TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

**CREDITORS ARE URGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY AND THE PLAN IN ITS ENTIRETY IN ORDER TO FORMULATE THEIR OPINION WITH RESPECT TO THE PLAN.  HOWEVER, IT IS ESPECIALLY IMPORTANT TO READ THE PLAN ITSELF, FOR IT IS THE CONTROLLING DOCUMENT.**

## PRELIMINARY STATEMENT

Conneaut Lake Park is unique.  The Park provides something that is rare and precious – free public access to lakefront property in the setting of a vintage amusement park.  This in turn provides value to the landowners and residents of Crawford County and the surrounding area.  It is this value that the Debtor seeks to protect and to grow.

The Debtor is emerging from a very troubled business history.  The revitalization of the amusement park, after many years of deferred capital needs, is a formidable task.  It requires an understanding that operational losses will be experienced before there is an uptick in business operations and profitability.  A successful reorganization hinges on the revitalization of the Park and that requires capital expenditures, care, and attention to the Park's aesthetics and attractions.  The Plan proposed by the Debtor does not require an immediate outlay of new money to accomplish the revitalization. Instead, it utilizes the Debtor's existing assets to fund its emergence from chapter 11.  Through the Plan, the Debtor seeks to sell certain of its real estate that, in the Debtor's view, will not diminish the charitable purpose of its assets.  The Debtor has carefully considered which parcels of its real property can be sold responsibly for private use in order to enhance and preserve the charitable purpose of the parcels the Debtor retains for use by the general public.

By providing to pay Allowed Secured Tax Claims in full within a year, Allowed Secured Non-Tax Claims in full over 20 years at 5.00% interest, with the option for a balloon payment after 10 years, and offering holders of Allowed Unsecured Claims the potential for a modest recovery that would not exist in a liquidation of the Debtor's assets, the Debtor hopes that its key stakeholders will accept the Plan and stand with the Debtor's reorganization efforts to renew Conneaut Lake Park by creating a year-round destination for the benefit of all creditors and the community.

2

# I.    BACKGROUND

1.    **Name of Debtor:**

TRUSTEES OF CONNEAUT LAKE PARK, INC.

2.    **Type of Debtor (individual, partnership, or corporation):**

The Debtor is a non-profit corporation organized in 1997 under the laws of the Commonwealth of Pennsylvania.

3.    **Debtor's Business or Employment:**

The Debtor has the corporate purpose, among other things, to preserve and maintain Conneaut Lake Park, a vintage amusement park, for historical, cultural, social and recreational, and civic purposes for the benefit of the community and the general public.  The Debtor holds in trust for use by the general public 208.213 acres of land and the improvements thereon located in Crawford County, Pennsylvania (the "*Real Property*").

The Real Property is home to the Conneaut Lake Park, the Hotel Conneaut, Camperland, 2 park office buildings, the Expo Center, a maintenance shop and several smaller parcels that house rental or vacation homes owned by individuals who are lessees under nonresidential or residential real property leases.  In the Debtor's view, certain parcels of the Real Property are not necessary for the Debtor's core operations or to maintain the overall charitable purpose for which the Real Property was put into charitable trust (each a "*Noncore Parcel*" and collectively, the "*Noncore Parcels*").  The Noncore Parcels are identified in the Conneaut Lake Park Land Use Plan in light green and attached to the Plan as Schedule 2.24.

The Debtor's main sources of operating revenue comprise:  (a) sales generated by Park operations; (b) rental income owed to it by various lessees under land, equipment, facility and/or marina leases; (c) parking and camping revenues; and (d) grants.

The Debtor's day-to-day operations are presently under the management of Economic Progress Alliance of Crawford County ("*EPACC*"), itself a 501(c)(6) tax exempt organization.  EPACC is certified by the Commonwealth of Pennsylvania as an economic development organization whose mission is to improve the quality of life in Crawford County, Pennsylvania by promoting, facilitating and supporting viable economic development opportunities.

The Debtor and EPACC entered into that certain Trustees of Conneaut Lake Park, Inc. Services Contract dated as of June 19, 2014 (the "*Management Agreement*").  The Management Agreement has an effective date of May 1, 2014, is renewed annually concurrent with approval of its annual operating budget, and expires by its terms on April 30, 2024.

**4.**     **Date of Chapter 11 Petition:**  December 4, 2014

**5.**     **Events that Caused the Filing and Postpetition Bankruptcy Events.**

A.     <u>Events that Caused the Filing</u>:

Following the transfer of the Real Property into trust and the creation of the Debtor in 1997, the Debtor ceased paying real estate taxes on the Real Property. Notwithstanding the Debtor's status as a nonprofit corporation and the Real Property being held in public trust, Crawford County, Sadsbury Township, Summit Township and Conneaut School District (collectively, the "*Local Taxing Authorities*" and each a "*Local Taxing Authority*") continued assessing and liening taxes against the Real Property that aggregate approximately $930,000  (defined as "*Secured Tax Claims*" in the Plan).

Since 2008, Park Restoration, LLC has managed, operated or leased the Beach Club, the Hotel Conneaut, and certain real property known as the McClure Home, all located on the Debtor's Real Property.  In August 2013, a fire destroyed the Beach Club owned by the Debtor while Park Restoration was in possession, using, and occupying the facility.

In September 2014, the Local Taxing Authorities commenced a foreclosure action in the Court of Common Pleas of Crawford County, Civil Division, Case No. EX 2014-197 (the "*Foreclosure Action*") pursuant to which they sought to sell the Real Property in a sheriff's sale scheduled on December 5, 2014 and recover payment of the Secured Tax Claims.  The Pennsylvania Attorney General's Office intervened in the Foreclosure Action by filing Preliminary Objections asserting, among other things, that the Secured Tax Claims were improperly assessed in the first instance because the Real Property is held in trust for public benefit.

On December 3, 2014, the Orphan's Court overruled the Attorney General's Preliminary Objections, allowing the December 5, 2014 scheduled sheriff's sale to move forward. On December 4, 2014, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code with this Court.  This bankruptcy case was filed for the purpose of (a) staying the sheriff sale; and (b) allowing the Debtor to formulate a plan of reorganization that addresses its various obligations, including the Allowed Secured Tax Claims, and enables the Debtor to emerge as a viable entity operating in furtherance of the charitable purposes for which it was created.

B.    Postpetition Events.

a.    The DIP Loans

In May 2015, the Bankruptcy Court entered an interim order (the "*Interim DIP Loan Order*") authorizing the Debtor to enter into a debtor-in-possession loan in the amount of $150,000.00 funded by EPACC (the "*EPACC DIP Loan*").  In June 2015, the Bankruptcy Court entered a final order (the "*Final DIP Loan Order*") authorizing the EPACC DIP Loan on a final basis and approving a second DIP Facility in the amount of $150,000.00 funded by the Northwest Pennsylvania Regional Planning and Development Commission (the "*Commission*") in July 2015 (the "*Commission DIP Loan*" together with the EPACC DIP Loan collectively, the "*DIP Loans*").  In order to secure repayment of the DIP Loans, and pursuant to the Final DIP Loan Order, the Debtor granted (i) liens on all of its assets in favor EPACC and the Commission, junior only to valid liens existing as of the Petition Date; and (ii) priority administrative expense claims, junior only to the professional administrative expenses incurred by the Debtor's estate.

With the funding provided by the DIP Facilities, the Debtor has made certain capital improvements to the Real Property and funded its postpetition operations, including, readying the Park and opening it for the 2015 season.

b.    Park Restoration

The Debtor and Park Restoration have a strained business relationship.  By notice dated March 20, 2015, the Debtor declared Park Restoration to be in default of its obligations under the various Park Restoration Agreements and terminated the Park Restoration Agreements effective on or before April 18, 2015.  The Debtor asserts claims for money damages and eviction against Park Restoration (collectively, the "*Park Restoration Obligations*").  The Debtor anticipates that a separate adversary proceeding will be required to resolve the Park Restoration Obligations.

Additionally, Park Restoration maintained a casualty insurance policy insuring the value of the Beach Club.  Following the 2013 fire and complete destruction of the Beach Club, the insurer interpleaded $611,000 (the "*Insurance Proceeds*") into a state court lawsuit pending resolution of competing claims to the Insurance Proceeds.  That state court lawsuit was removed to the Bankruptcy Court and is pending at Adversary Proceeding No. 15-01010 JAD (the "*Insurance Litigation*").  In the Insurance Litigation, the Debtor maintains (i) that Park Restoration, as the manager of the Beach Club and having a contractual obligation to keep the Beach Club in good repair, to secure and maintain it in a commercially reasonable manner, and to indemnify the Debtor against any losses to the facility, insured the value of the Beach Club for the benefit of the Debtor; and (ii) that the insurance policy, by its own terms, insures the value of the Debtor's interest in the Beach Club.  Additionally, the Debtor and the Local Taxing Authorities assert that a Pennsylvania statute requires payment of all delinquent real

estate taxes assessed against the property on which the Beach Club was located out of the Insurance Proceeds before any amounts may be remitted by the insurer to the owner of the insured interest.    Park Restoration denies the Debtor's claim to the Insurance Proceeds and asserts that the Pennsylvania statutory provision requiring payment of the Insurance Proceeds to the Taxing Authorities is unconstitutional.    These claims are presently before the Bankruptcy Court on cross motions for summary judgment that have not yet been decided.

c.      Termination of Exclusivity

Chapter 11 provides a debtor-in-possession with approximately four (4) months of exclusivity within which only the debtor may file a chapter 11 plan, subject to the right of the debtor to request an extension of the exclusivity period.    Given the complexity of this chapter 11 case, the emergency filing, the various contingencies affecting the source of funding for the Plan, and the novelty of some of the issues involved in this bankruptcy case, the Debtor moved for, and obtained, an extension of the exclusivity period for filing a plan through August 1, 2015.    The Debtor obtained the initial extension of the exclusivity period over the objection of the Local Taxing Authorities.

Despite waiting over 14 years and permitting the Secured Tax Claims to grow to exorbitant amounts before seeking to enforce its claims, the Local Taxing Authorities have aggressively pursued their claims in the Debtor's bankruptcy case and voiced objections at nearly every action taken by the Debtor.    In their objection to the Debtor's request for an extension of the exclusivity period, the Taxing Authorities threatened to file a competing chapter 11 plan (the "*Liquidating Plan*"), one that seeks to liquidate the entirety of the Debtor's Real Property free and clear of its charitable purpose for the benefit of the Local Taxing Authorities and to the detriment of the Debtor's other secured creditors, its unsecured creditors, the cottage lessees and property owners, and the people of Crawford County, Pennsylvania.    Feasibility of the Liquidating Plan, however, hinges on a significant contingency.    It requires, among other things, that the charitable use restriction be divested from all of the Debtor's Real Property over the expected opposition from the Attorney General for the Commonwealth of Pennsylvania.

Following a meet and confer with the Local Taxing Authorities held in September 2015, it became clear that under the Liquidating Plan, the Park would be lost whether or not the charitable use restriction is lifted.    As such, the Debtor made a strategic decision not to oppose termination of the exclusivity period, and to allow the Local Taxing Authorities the opportunity to file the Liquidating Plan.    Creditors now have a difficult, but clear choice:  (a) provide the Debtor with an opportunity to cash flow its reorganized vision of the Park and surrounding community; or (b) liquidate the Debtor's Assets in their entirety and close the Park.

While only Creditors may vote on the Liquidating Plan or the Debtor's Plan, it is the Debtor's view that the public has a right to be heard on whether the charitable use restriction may be lifted.  If the charitable use restriction is not lifted in its entirety from

the Assets, then under the Liquidating Plan, the Local Taxing Authorities will proceed to a state court foreclosure, creating the potential for a blighted Conneaut Lake community.

### d.      The Postpetition Retention Applications

In furtherance of its efforts to obtain sale proceeds to fund its reorganization, the Debtor has filed certain retention applications with the Bankruptcy Court.  The first retention application seeks to retain Greg Rubino of Passport Realty, LLC as real estate broker for purposes of selling the Flynn Property and, if needed, additional Noncore Parcels.  The Debtor has also filed a retention application seeking to employ the services of the Shafer Law Firm as special counsel for the specified matters described therein, including, legal services necessary and appropriate to clear title and close on the sale of the Flynn Property.  These retention applications were granted by the Bankruptcy Court.  On October 8, 2015, the Bankruptcy Court granted the Debtor's application to retain Porter Consulting Engineers, P.C. to provide the following engineering services to the Estate: (a) conduct a subdivision survey, and prepare and submit appropriate permit applications for the sale of the Noncore Parcels; (b) prepare project designs for the expansion of Camperland; and (c) review and evaluate the current condition of the Waterpark functionality and permitting to determine the viability of the existing Waterpark facilities.

### e.      The Harris Claim

On July 15, 2015, "Gary Harris & Alter Ego for MM-E, 16401, Concore, Richman, Resort, Asset Mgmt Trust et al & 3740 Corp dba The Water Company" ("*Harris*") filed a Proof of Claim in the amount of $1,430,000.30 as a secured, priority, and unsecured claim based upon being the "actual purchaser of Conneaut Lake Park Assets approved by this court June 11, 1996" (the "*Harris Claim*").  *See* Claims Register, Claim No. 24-1.  The Harris Claim was filed pursuant to that certain Order of Court dated June 16, 2015 at Doc. No. 146 disallowing a pleading Harris had filed on June 4, 2015 purporting to assert a claim against the Estate and providing Harris with a July 15, 2015 deadline to submit a conforming proof of claim.

The Harris Claim is groundless and without merit and is a Disputed Claim (as defined in the Plan) because, among other things, a number of events occurred since June 11, 1996 pursuant to which any and all right, title, and interest Harris may have had to the Debtor's assets were transferred and assigned to the Debtor free and clear of Harris' claims. *See e.g.* Bragg Declaration, Exhibit A p. 41 ¶ 11 at Document No. 22 (Order of Court entered by the Court of Common Pleas of Crawford County upholding the deed conveying the Real Property and related assets to the Debtor into a charitable trust and voiding the purported 99 year lease that Harris claims gave him possessory interests in the Real Property and related assets.)  Accordingly, no value is placed by the Debtor on the Harris Claim.

**6.      Anticipated Future of the Company & Source of this Information and Opinion**

The Debtor is implementing its reorganization through capital improvements and strategic planning that will minimize the seasonal impact of its business operations by becoming a year-round destination.  The Reorganized Debtor will generate increased seasonal revenues with an expanded Camperland and Waterpark and will generate presently "off-season" revenues by, among other things, re-acquiring possession of the Hotel Conneaut and constructing a Performing Arts Center.

As set forth in more detail in the Debtor's cash flow projections attached hereto as Exhibits II through VII and in Section Article VI, below, the Debtor estimates that its operations will become profitable in 2017 and beyond.  EPACC, in its capacity as the Debtor's manager of day-to-day operations, and public records are the main sources of this information and opinion.  While the operating history for the Debtor during the Bankruptcy Case is short (only two months since the 2015 season opened), the information available and maintained by EPACC for that period is accurate and detailed.  Moreover, the Debtor compared its actual performance for the 2015 operating season against its projections made in support of its motion to obtain the DIP Loans (the "*2015 Comparison*").  *See* Omnibus Reply to Objections to Amended Disclosure Statement, Exhibit A at Doc. No. 237.  The 2015 Comparison reveals that the Debtor beat its projections on the revenue-side by over 45% and underestimated expenses by only 16%.  Importantly, the primary cause for the underestimation in expenses was the increased labor costs needed to service the better-than-projected attendance at the Park.

**7.      Summarize all Significant Features of the Plan Including When and How Each Class of Creditor Will Be Paid and What, if Any, Liens Will Be Retained By Secured Creditors or Granted to Any Creditor Under the Plan**

The Debtor is funding its reorganization and payment of the Allowed Secured Tax Claims principally by:  (a) selling the Noncore Parcels; (b) making capital improvements to the Park and increasing revenues generated by the Park; (c) reducing the amount of Real Property subject to taxation by seeking and obtaining tax exempt status; and (d) utilizing the Insurance Proceeds or any recoveries the Debtor makes on the Park Restoration Obligations.

<u>Plan Overview</u>

The Debtor anticipates that Allowed Secured Tax Claims will be satisfied from the Insurance Proceeds and, to the extent unpaid following the disposition of the

Insurance Proceeds by the Court, then from the sale proceeds from the Flynn Property which is projected to be sold in 2016.  To the extent Net Available Sale Proceeds exist following the sale of any Noncore Parcel, those proceeds will be distributed to holders of Allowed Secured Non-Tax Claims in accordance with their priority under applicable nonbankruptcy law.  The Net Available Sale Proceeds is defined to exclude a $300,000 Working Capital Carve-Out from Noncore Parcels sold in 2017 and 2018.  The Working Capital Carve-Out is contingent.  If the entirety of the Insurance Proceeds benefit the Debtor's Estate, it will obviate the need for the Working Capital Carve-Out and the Debtor will not seek nor utilize a Working Capital Carve-Out.

In addition to the Net Available Sale Proceeds, the Debtor anticipates making Quarterly Installments of Cash to holders of Allowed Secured Non-Tax Claims commencing on the first business day in January 2017.  The Quarterly Installments will be funded by the Reorganized Debtor's operations and will be distributed on a *pro rata* basis to holders of Allowed Secured Non-Tax Claims.  The amount of the Quarterly Installment payable to holders of Allowed Secured Non-Tax Claims is based upon amortizing $1,800,000 over 20 years at 5.00% interest per annum and is calculated to provide the present value of the Allowed Secured Non-Tax Claims as of the Effective Date.  The holders of Allowed Secured Non-Tax Claims consenting to the contingent Working Capital Carve-Out, however, will receive a balloon payment of the balance of its Allowed Secured Claim on the 10th Anniversary of the Initial Distribution Date. Those holders of Allowed Secured Claims that do not consent to the Working Capital Carve-Out will receive a lien on the Debtor's cash and accounts receivable junior only to the existing liens held by Class 6 ($339,550.44), Class 7 ($75,597.61) and Class 16 ($300,000).

Finally, the Plan provides for the Debtor to make Quarterly Installments of Net Available Cash, if any, to the holders of Allowed Unsecured Claims commencing on the first Business Day in October 2018 and continuing thereafter for seven (7) Calendar Quarters.

<u>Sale of the Noncore Parcels</u>

The Debtor has identified six (6) Noncore Parcels:  the Flynn Property, the Reed Avenue Property, the State Rte 618 Property, property located west of State Rte 618; the land where the Beach Club Site was located; and the Hotel Conneaut.  The marketability and value of the Noncore Parcels are substantially affected by the Debtor's ability to sell them free and clear of their charitable use restriction.  While the Office of the Attorney General has stated it will not object to the sale of the Flynn Property free and clear of the charitable use restriction, it has reserved its objections as to the other identified parcels. Accordingly, the Debtor is seeking authority in the Confirmation Order itself to sell all of

the Noncore Parcels free and clear of the charitable use restriction in order to maximize the marketing and value of these Noncore Parcels for the benefit of the Debtor's reorganization and the Estate's creditors.

In that regard, the Debtor has met with its retained Real Estate Agent, Greg Rubino of Passport Realty, LLC, its special counsel for real estate matters, Shafer Law Firm, and its engineering consultants, Porter Consulting Engineers, P.C. for the purposes of designing a marketing strategy for its Noncore Parcels that maximizes value to the Estate. The marketing strategy for the Flynn Property is to subdivide the lakefront parcels into five (5), at least 75-foot lots, consistent with zoning requirements, with three (3) backlots, and to sell the lakefront property for approximately $4,000 per lakefront linear foot. According to the Debtor's Real Estate Broker, $4,000 per lakefront linear foot is consistent with the market for lakefront property in the area.

The Debtor anticipates the sale of lakefront Flynn Property parcels ("**Flynn Phase I**") to occur during 2016 and for the backlot Flynn Property parcels ("**Flynn Phase II**") to occur in 2017 and 2018. The Debtor also anticipates selling the State Rte 618 Parcel in 2018. The Debtor does not, at this time, plan to market the remaining Noncore Parcels for sale in order to prevent over-supplying the local market and depressing the overall value of the Debtor's Real Property. The remaining Noncore Parcels will be marketed after the sale of the Flynn Property and the State Rte 618 Property or if the Debtor is not making its financial projections and the additional income is needed to fund its obligations under the Plan. The Debtor, however, will consider all reasonable offers it receives to purchase any of the remaining Noncore Parcels.

The Debtor's 2016 Cash Flow Projection (Exhibit III) shows aggregate sale proceeds for the Flynn Phase I lots in the amount of $1,499,995. The Debtor's 2017 and 2018 Cash Flow Projections (Exhibits IV and V) reveal $350,000 from the sale of the backlots in Flynn Phase II. The State Rte 618 Property is projected to yield a gross purchase price of $180,000 for its 2.5-3 acre size lot. The basis for the Debtor's value of these properties is derived from the market strategy formulated by the Debtor's Real Estate Agent with local knowledge and expertise of property values in the area. The Debtor received an executive summary appraisal supporting the marketing strategy and values for the single-home residential lots of the Flynn Properties. The Debtor does not yet have an executive summary appraisal for the remaining Noncore Parcels.

In the Confirmation Order for the Plan, the Debtor will seek authority to sell each of the Noncore Parcels free and clear of the charitable use restriction. Upon identification of a prospective purchaser, the Debtor will seek to sell the identified Noncore Parcel free and clear of all liens, claims and encumbrances by filing a motion or motions with the Bankruptcy Court seeking approval of such sale free and clear pursuant

to 11 U.S.C. Section 363.   Notwithstanding the foregoing, the provisions of the Plan providing for proposed sale of the Noncore Parcels free and clear of all claims and encumbrances is not intended to alter, by virtue of the entry of the Confirmation Order, any easement, right of way or other interest incident to the public water system operated by the Debtor ("**Water System**") and which is located on or impacts such Noncore Parcels.  Any such alteration of the easements, rights of way or other interests related to the Water System will be done consensually or through separate proceedings before the Court.  The right of the Pennsylvania Department of Environmental Protection to raise objections with respect to the Debtor's handling of the Water System is not altered by the Plan.

The sale proceeds from the Flynn Phase I Property will be utilized and disbursed in accordance with the waterfall distribution provisions set forth in the Plan and is anticipated to satisfy the Allowed Secured Tax Claims in full and, at least, the Allowed Secured Non-Tax Claim in Class 1.  The Net Available Sale Proceeds from the sale of the Flynn Phase II Property and the remaining Noncore Parcels, likewise will be distributed in accordance with the waterfall distributions provisions set forth in the Plan, subject to the contingent Working Capital Carve-Out.

<u>The Working Capital Carve-Out</u>

The Debtor proposes to fund its obligations under the Plan with revenue generated by the Debtor's operations, including the Park, the Hotel, Camperland, and the Convention Center.  The Debtor may invest approximately $300,000.00 (the "*Working Capital Carve-Out*") from the sale proceeds of Noncore Parcels after payment of the Allowed Secured Tax Claims to make necessary capital improvements to the Park and to offset budgeting shortfalls projected to occur in the Debtor's operations through calendar year 2016.

The Working Capital Carve-Out is contingent.  If the Debtor receives the entirety of the Insurance Proceeds, the Debtor will not need the Working Capital Carve-Out to fund future capital improvements.  Assuming, however, that the Debtor does not receive the Insurance Proceeds, the Debtor will seek the consent of the holders of Secured Non-Tax Claims to the Working Capital Carve-Out.  All holders of Secured Non-Tax Claims will receive Quarterly Installments on their Allowed Claims amortized over a 20 year period with 5.0% interest.  The holders of Secured Non-Tax Claims who consent to the Working Capital Carve-Out will receive a balloon payment on the tenth (10th) anniversary of the Initial Distribution Date equal to the then outstanding amount of their Allowed Claim.  The holders of Secured Non-Tax Claims who do not consent to the Working Capital Carve-Out will receive payment in full of their Allowed Secured Claims on the 20th anniversary of the Initial Distribution Date, plus a lien on the Reorganized

Debtor's cash and accounts receivable (the "***Adequate Protection***"), junior only to the security interests in favor of Classes 6, 7 and 16, i.e. the only creditors with existing Secured Claims against the Debtor's cash and accounts receivables.  Based upon the Debtor's cash flow projections, the Debtor anticipates sufficient value serving as Adequate Protection to provide the indubitable equivalent to the non-consenting holders of Allowed Secured Non-Tax Claims in exchange for the contingent Working Capital Carve-Out.

Proposed Treatment of Classes of Claims

The following summarizes treatment for creditors (both those holding unclassified claims and those holding classified claims) under the Plan.

A.      Unclassified Administrative Claims.

The Debtor shall pay any accrued and unpaid U.S. Trustee Fees in full on the Effective Date of the Plan.  All other Allowed Administrative Claim shall be paid by the Debtor, in full or in such amounts and on such other terms as may be agreed on between the holder of such Allowed Administrative Claim and the Debtor, or as otherwise ordered by the Court.  *See* Section IV(5), below for additional details.

The Allowed Administrative Claims shall be funded from: (a) proceeds from the DIP Loans on the Effective Date of the Plan; (b) proceeds from the sale of the Noncore Parcels, including the Flynn Property, in amounts agreed upon or ordered pursuant to 11 U.S.C. § 506(c); (c) the Insurance Proceeds available after payment of the Allowed Secured Tax Claims on Parcel ID No. 5513-001; and (d) Reorganized Debtor's operations.

B.      Class 1 Allowed Secured Tax Claims.

(a)      Class 1 Allowed Secured Tax Claims are impaired under the Plan.  The holders of Allowed Secured Tax Claims shall share *pro rata* in the following distributions:
  (i)      From the Insurance Proceeds for the Parcel ID 5513-001; and
  (ii)      From the proceeds of the sale of a Noncore Parcel, including the Flynn Property, after payment of Allowed Administrative Claims in amounts agreed upon or ordered pursuant to 11 U.S.C. § 506(c), until the Allowed Secured Tax Claims have been satisfied.

In the event the closing on the sale of the Flynn Property occurs before

disbursement of the Insurance Proceeds, the portion of the sale proceeds payable on account of Allowed Secured Tax Claims shall be held in escrow until the Insurance Proceeds have been disbursed.

(b)    The holders of Allowed Secured Tax Claims also shall:

  (i)    retain their liens on the Retained Parcels; and

  (ii)    share *Pro Rata* on account of such Allowed Secured Tax Claims deferred Cash payments from the Distribution Account in Quarterly Installments of $35,700.00 each, commencing on the Initial Distribution Date and continuing thereafter on each subsequent Distribution Date until such holders of Class 1 Claims have received at least the Allowed amount of such claim, with interest accruing postpetition at the rate of 9% per annum until paid in full, or in such other amounts as agreed upon by the holders of Class 1 Claims.

It is anticipated that Class 1 Claims will be satisfied on or before the Initial Distribution Date from the Insurance Proceeds and the sale proceeds from the Flynn Property.

C.    Classes 2 through 15 Allowed Secured Non-Tax Claims.

(a)    Classes 2 through 15 Allowed Secured Non-Tax Claims are impaired under the Plan. The holders of Allowed Secured Non-Tax Claims in Classes 2 through 15 shall receive Distributions from the Net Available Sale Proceeds, in accordance with their priority under applicable nonbankruptcy law. Accordingly, the Net Available Sale Proceeds shall be disbursed first to the holder of the Class 2 Allowed Secured Non-Tax Claim until paid in full, then to the holder of the Class 3 Allowed Secured Non-Tax Claim until paid in full, then to the holder of the Class 4 Allowed Secured Non-Tax Claim until paid in full, and continuing on thereafter in numerical order until the holder of the Class 15 Allowed Secured Non-Tax Claim has been paid in full. *See* Section II(1) for a list of the holders of the Allowed Secured Non-Tax Claims and their respective assigned Class.

(b)    To the extent the Net Available Proceeds are insufficient to pay the holders of a Class of an Allowed Secured Non-Tax Claim in full, holders of such Allowed Secured Non-Tax Claims shall:

  (i)    retain their liens on the Retained Parcels; and

  (ii)    share *Pro Rata* with each holder of an Allowed Secured Non-Tax Claim regardless of Class, deferred Cash payments from the Distribution Account in Quarterly Installments of $35,700.00 each*, commencing on the Initial Distribution Date immediately

13

following payment in full of Allowed Class 1 Claims, and on each subsequent Distribution Date thereafter until such holders of Class 2 through 15 Claims have received at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the Estate's interest in such Retained Parcels.  The holders of Allowed Secured Non-Tax Claims will receive interest on the Allowed amount of their Claim at the rate of 5.00% per annum.

*The Quarterly Installment is calculated to repay Allowed Secured Non-Tax Claims in full over 20 years from the Initial Distribution Date at 5.0% interest per annum.  The holders of Allowed Secured Non-Tax Claims who consent to the Debtor's contingent Working Capital Carve-Out will receive a balloon payment equal to the then outstanding balance of its Allowed Secured Claim on the 10th Anniversary of the Initial Distribution Date.  The Debtor will fund the balloon payment out of its future operations.  To the extent a holder of an Allowed Secured Non-Tax Claim does not consent to the Debtor's contingent Working Capital Carve-Out, the holder will receive a lien on the Reorganized Debtor's cash and accounts receivable junior only to the existing liens on such cash and accounts receivable.  In the event the Debtor's estate receives the entirety of the Insurance Proceeds, the Working Capital Carve-Out will not be sought or used by the Debtor.

D.    Class 16 Allowed Secured DIP Lender Claims.

(a)    Class 16 Allowed Secured DIP Lender Claims are unimpaired under the Plan.  The holders of Allowed Secured DIP Lender Claims shall share *Pro Rata* in the Net Available Sale Proceeds following payment in full of each holder of an Allowed Secured Non-Tax Claim in Classes 2 through 15.

(b)    To the extent the Net Available Sale Proceeds are insufficient to pay the holders of an Allowed Secured DIP Lender Claims in full, holders of such claims shall:

(i)    retain their liens on the Retained Parcels; and

(ii)    receive on account of such Allowed Secured DIP Lender Claims deferred Cash payments consistent with the terms and conditions set forth in the Final DIP Loan Order.

(c)    To the extent the Net Available Sale Proceeds are insufficient to pay the Allowed Secured DIP Lender Claims in full, the deficiency that remains due and payable to the holders of an Allowed Secured DIP Lender Claim shall be treated

14

and paid as a Class 17 Allowed Priority Unsecured DIP Lender Claim.

E.    <u>Class 17 Allowed Priority Unsecured DIP Lender Claims.</u>

Class 17 Allowed Priority Unsecured DIP Lender Claims are unimpaired under the Plan.  The holder of an Allowed Priority Unsecured DIP Lender Claim shall receive payment in full of its claim consistent with the terms of the Final DIP Loan Order prior to any Distribution on account of Class 18 Allowed Unsecured Claims; <u>provided</u> <u>however,</u> that so long as the Reorganized Debtor is not in default of under the terms of the DIP Loans, Reorganized Debtor may commence Distributions on account of Class 18 Claims.

F.    <u>Class 18 Allowed Unsecured Claims.</u>

Class 18 Allowed Unsecured Claims, other than Priority Tax Claims, are impaired under the Plan.  Commencing on the first Business Day of October 2018, and ending on or before the Distribution Date that is seven (7) Calendar Quarters thereafter, the holders of Class 18 Claims shall share *Pro Rata* in deferred Quarterly Installments of Net Available Cash, if any, funded by the Reorganized Debtor's operations.

The Debtor estimates a total of between $50,000 and $100,000 will be distributed on account of Allowed Class 18 Claims between October 2018 and July 2020.  Based upon an estimated Allowed Class 18 Claim pool of approximately $900,000.00, the Debtor estimates a 5% to 10% dividend will be made on account of Allowed Class 18 Claims.  The Reorganized Debtor, however, does not guarantee the amount nor the timing of any Distribution to be made on account of Allowed Class 18 Claims.  Additionally, any default by the Reorganized Debtor in payment of its DIP Loan obligations may result in a cessation of payments on account of Class 18 Allowed Unsecured Claims.

G.    <u>Class 19 Allowed Interests of Equity Holders.</u>

The Debtor is a nonprofit corporation and has no Equity Holders.  The Debtor's Board of Trustees appointed in June 2014 and serving in a volunteer capacity without compensation shall continue to serve the Reorganized Debtor in such capacity and on such terms.

**8.    Are All Monthly Operating Statements Current and on File With The Clerk of Court?**    Yes  <u> X </u>    No  _____

**If Not, Explain:**  N/A

9.      **Does the plan provided for releases of nondebtor parties?  Specify which parties and terms of release.**

No

10.     **Identify all executory contracts that are to be assumed or assumed and assigned.**

A.      The Management Agreement between the Debtor and Economic Progress Alliance of Crawford for administrative and property management services with a ten (10) year term commencing on May 1, 2014 and terminating on April 30, 2024.

B.      Bill's Midway Marina lease of docks and convention center for storage.

C.      All cottage leases identified on the Debtor's Amended Schedule G at Document No. 149 to the extent (1) the lease was not terminated prior to the Petition Date in a sale of the fee simple interest to the lessee; and (2) the present lessee elects not to purchase the property subject to the lease from the Debtor in a sale free and clear of all interests pursuant to the Plan and section 1146(c) of the Bankruptcy Code.

Any executory contracts and unexpired leases not expressly assumed by the Reorganized Debtor are deemed rejected.  Additionally, by way of clarification and further disclosure, any executory contract or lease listed on Amended Schedule G with Park Restoration as a counterparty has been terminated by the Debtor pursuant to applicable nonbankruptcy law for Park Restoration's failure to perform under the Agreements.  Accordingly, these Park Restoration Agreements are not subject to assumption or rejection by the Debtor's estate.

11.     **Has a bar date been set?      Yes  <u>X</u>      No  _____**

A Bar Date was set for June 4, 2015 for nongovernmental creditors and June 2, 2015 for all governmental units.

12.     **Has an election under 11 U.S.C. §1121(e) has been filed with the Court to be treated as a small business?  Yes  _____      No  __X__**

16

**13.** **Specify property that will be transferred subject to 11 U.S.C. §1146(c).**

The Debtor intends to sell its Noncore Parcels free and clear of all claims and encumbrances and charitable use restrictions, to the extent necessary to funds it Plan, pursuant to Sections 363(f) and 1146(c) of the Bankruptcy Code.   The Noncore Parcels identified by the Debtor that likely will be subject to sale include:

A.      The Flynn Property;

B.      The State Route 618 Property;

C.      The Reed Avenue Property

D.      The Beach Club Site;

E.      The Hotel Conneaut; and

F.      Any parcels subject to a cottage lease in which the current lessee and the Debtor agree to convey fee simple title to the parcel from the Debtor to the lessee for a sum to be determined.

## II.    CREDITORS

### 1.    Secured Claims

| Creditor | Total Amount Owed | Class | Type of Collateral Priority of Lien (1, 2, 3) | Disputed (D) Liquidated (L) Unliquidated (U) | Will Liens Be Retained Under the Plan? (Y) or (N) |
|---|---|---|---|---|---|
| Berkheimer Associates | $40,329.95 | 3 | 3/17/1999 Judgment Lien – Real Property (Third Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $131,845.56 | 8 | 8/27/2004 Judgment Lien – Real Property (Eighth Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $339,550.44 | 6 | 3/7/2003 Mortgage and Mortgage & Security Agreement – Real and Personal Property (6th Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $19,270.35 | 10 | 12/30/2004 Judgment Lien – Real Property (10th Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $47,798.70 | 13 | 2/8/2007 Judgment Lien – Real Property (13th Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $44,370.93 | 15 | 1/8/2009 Judgment Lien – Real Property (15th Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $23,238.86 | 9 | 10/2/2004 Judgment Lien – Real Property (9th Lien Position) | Not Disputed | Y |
| Conneaut School District | $636,496.82 | 1 | Municipal tax lien – Real Property (1st Lien Position) | Not Disputed | Y |
| Crawford County Tax Claim Bureau | $235,176.85 | 1 | Municipal tax lien – Real Property (1st Lien Position) | Not Disputed | Y |

| Creditor | Total Amount Owed | Class | Type of Collateral Priority of Lien (1, 2, 3) | Disputed (D) Liquidated (L) Unliquidated (U) | Will Liens Be Retained Under the Plan? (Y) or (N) |
|---|---|---|---|---|---|
| Donald G. Kaltenbaugh | $65,523.45 | 12 | 12/15/2006 Judgment Lien – Real Property (12th Lien Position) | Not Disputed | Y |
| First Capital Finance, Inc. | $189,521.90 | 2 | 1998 Judgment Lien – Real Property (2nd Lien Position) | Not Disputed | Y |
| Joseph J. & Isabel J. Prischak | $250,000.00 | 5 | 3/26/2002 Judgment Lien – Real Property (5th Lien Position) | Disputed | Y |
| Joseph J. & Isabel J. Prischak | $574,089.31 | 11 | 6/1/2006 Judgment Lien – Real Property (11th Lien Position) | Disputed | Y |
| Mercer County State Bank | $75,597.61 | 7 | 5/21/2004 Mortgage – Real Property (7th Lien Position) | Not Disputed | Y |
| Quinn, Buseck, Lemhuis, Toohey & Kroto | $8,889.46 | 18 | 1998 Judgment Lien that appears to have lapsed and been revived on November 16, 2014 and subject to lien avoidance as a preferential transfer | Disputed | No |
| Sadsbury Township | $12,211.20 | 1 | Municipal Tax Lien – Real Property (1st Lien Position) | Not Disputed | Y |
| Summit Township | $2,794.66 | 4 | 6/7/2000 Judgment Lien – Real Property (4th Lien Position) | Not Disputed | Y |
| Summit Township | $43,928.08 | 1 | Municipal Tax Lien – Real property (1st Lien Position) | Not Disputed | Y |
| US Foodservice | $20,218.21 | 14 | 1/22/2008 Judgment Lien – Real Property (14th Lien Position) | Not Disputed | Y |

| | | | | | |
|---|---|---|---|---|---|
| Economic Progress Alliance of Crawford County | $150,000 | 16 | Debtor-in-possession loan – All debtor's assets (16th Lien Position) | Not Disputed | Y |
| Northwest Pennsylvania Regional Planning and Development Commission | $150,000 | 16 | Debtor-in-possession loan – All debtor's assets (16th Lien Position) | Not Disputed | Y |
| **TOTAL** | **$3,060,852.34** | | | | |

2.    **Priority Tax Claims**

| Creditor | Total Amount Owed | Disputed (D) Liquidated (L) Unliquidated (U) |
|---|---|---|
| Sadsbury Township | $2,555.05* | |
| Summit Township | $12,966.46* | |
| Crawford County | $540.00 | |
| Conneaut School District | $20,003.27 | |
| **TOTAL** | **$36,064.78** | |

* These are amounts were scheduled by the Debtor.  The proof of claim filed by these taxing authorities did not include any amounts for priority tax claims.  To the extent the amounts due for 2014 have been liened and are included within the creditor's Class 1 Allowed Secured Tax Claim, it is a disputed Priority Tax Claim.

3.      **Unsecured Claims**

| | | |
|---|---|---|
| A. | Amount Debtor Scheduled (Disputed and Undisputed) | $  884,844.32 |
| B. | Amount of Unscheduled Unsecured Claims[1] | $1,844,845.95 |
| C. | Total Claims Scheduled or Filed | $2,729.690.27 |
| D. | Amount Debtor Disputes | $1,844,845.95 |
| **E.** | **Estimated Allowable Unsecured Claims** | **$  884,844.32** |

(The values in No. 3, 4 & 5 are subject to change pending a final determination of the amount of unsecured claims that the Debtor will dispute.  As of the date of this Disclosure Statement, the Debtor has not made a final determination as to which claims, if any, it will dispute.  Any omission of a notice of dispute is not a tacit admission that a claim will not be subject to dispute in the future.)

4.      **Other Classes of Creditors -** NONE

5.      **Other Classes of Interest Holders -** NONE

---

[1] Includes (a.) unsecured claims filed by unscheduled creditors; (b.) that portion of any unsecured claim filed by a scheduled creditor that exceeds the amount debtor scheduled; and (c.) any unsecured portion of any secured debt not previously scheduled.

### III.    ASSETS

On its Schedules, the Debtor placed book values for its real and personal property assets based upon 2013 Federal Tax Returns, adjusted for known material deletions and additions.  Commencing with its first Monthly Operating Report filed in January of 2015, the Debtor reflected the 2013 book value of the personal property less depreciation of that personal property through 2013 in the amount of $3,983,518.84.  The Assets listed below reflect the 2013 book values less depreciation on the personal property.

| Assets | Scheduled Amount | Value as of the Petition Date | Basis for Value |
|---|---|---|---|
| Total Real Property Value | $2,955,000.00 | $2,029,995 | The Debtor's Real Property is subject to a charitable use restriction.  The Debtor asserts that the charitable use restriction may be lifted on only a portion of the Real Property.  To the extent the charitable use restriction remains with a parcel of the Real Property, the Debtor asserts there is no current market for purchase of that parcel.  Presently, the Debtor has a good faith basis to believe that it can sell the Flynn Property, Reed Avenue Property and State Rte 618 Property free and clear of the charitable use restriction and therefore values its Real Property for at least $2,029,995.<br><br>The basis for the Debtor's value of these properties is derived from the market strategy formulated by the Debtor's Real Estate Agent.  The Debtor received an executive summary appraisal supporting the marketing strategy for the single-home residential lots of the Flynn Properties.  The Debtor does not yet have an executive summary appraisal for the remaining Noncore Parcels. |

| | | | |
|---|---|---|---|
| Accounts Receivable | $280,809.08 | $0.00 | As of the Petition Date, these receivables were in excess of 180 days past due and, in the Debtor's opinion, are uncollectable. |
| Contingent & Unliquidated Claims | $611,000.00 | $611,000.00 | $611,000 is interpleaded with the Bankruptcy Court in the Insurance Litigation.  The Debtor asserts that the $611,000 is payable to the estate because Park Restoration insured the value of the estate's interest in the Beach Club; or, alternatively, in satisfaction of the indemnification obligations and damages owed by Park Restoration to the Debtor's estate in connection with the Park Restoration Agreements. |
| Checking Account First National Bank | $2,234.10 | $2,234.10 | Cash value |
| Checking Account Mercer County State | $ 73,677.16 | $ 73,677.16 | Cash value |
| Savings Account Mercer County State Bank | $ 2,668.55 | $ 2,668.55 | Cash value |
| Checking Account Mercer County State Bank | $3,063.07 | $3,063.07 | Cash value |
| Office Equipment, supplies, furnishings etc. | $158,595.84 | $158,595.84* | Book value based upon 2013 Federal Tax Return.  *See "Personal Property Depreciation" line item below affecting the value of this asset. |

| | | | |
|---|---|---|---|
| Machinery, Equipment and supplies | $664,828.00 | $664,828.00* | Book value based upon 2013 Federal Tax Return.  *See "Personal Property Depreciation" line item below affecting the value of this asset. |
| Personal Property – Amusement Park Rides | $2,430,000.00 | $2,430,000.00* | Book value based upon 2013 Federal Tax Return.  *See "Personal Property Depreciation" line item below affecting the value of this asset. |
| Less Personal Property Depreciation | NA | ($3,983,518.84) | The change in the Board of Trustees in June 2014 resulted in a diligent review of the Debtor's books and records.  The review has brought about needed adjustments in the previously recorded asset values and liabilities.  The 2013 Tax Return was utilized in preparing the Debtor's Schedules and Statements and its Monthly Operating Reports, adjusted for known material corrections, in order to provide book values and depreciation.  The compiled financials have not yet been finalized and may result in additional adjustments. |
| **TOTAL:** | **$7,181,875.80** | **$2,722,638.88** | |

1.      **Are any assets which appear on Schedule A or B of the bankruptcy petition not listed above?**  NO

2.      **Are any assets listed above claimed as exempt?**  NO

## IV.   SUMMARY OF PLAN

**1.     Effective Date of Plan:**

The Effective Date of the Plan is the first Business Day after the Confirmation Order becomes a Final Order.

**2.     Will cramdown be sought?  _X_ Yes        ___ No**

**3.     Treatment of Secured Non-Tax Claims**

### SECURED NON-TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Summary of Proposed Treatment |
|---|---|---|---|
| Berkheimer Associates | 3 | $40,329.95 | The holders of Allowed Secured Non-Tax Claims in Classes 2 through 15 are impaired under the Plan and shall receive Distributions from the Net Available Sale Proceeds, in accordance with their priority under applicable nonbankruptcy law. Accordingly, the Net Available Sale Proceeds shall be disbursed first to the holder of the Class 2 Allowed Secured Non-Tax Claim until paid in full, then to the holder of the Class 3 Allowed Secured Non-Tax Claim until paid in full, then to the holder of the Class 4 Allowed Secured Non-Tax Claim until paid in full, and continuing on thereafter in numerical order until the holder of the Class 15 Allowed Secured Non-Tax Claim has been paid in full. |
| Conneaut Lake Joint Municipal Authority | 8 | $ 131,845.56 | |
| Conneaut Lake Joint Municipal Authority | 6 | $339,550.44 | |
| Conneaut Lake Joint Municipal Authority | 10 | $19,270.35 | |
| Conneaut Lake Joint Municipal Authority | 13 | $47,798.70 | |
| Conneaut Lake Joint Municipal Authority | 15 | $44,370.93 | To the extent the Net Available Proceeds are insufficient to pay the holders of a Class of an Allowed Secured Non-Tax Claim in full, holders of such Allowed Secured Non-Tax Claims shall: |
| Conneaut Lake Joint Municipal Authority | 9 | $23,238.86 | (a)  retain their liens on the Retained Parcels; and |
| Donald G. Kaltenbaugh | 12 | $65,523.45 | (b)  share *Pro Rata* with each holder of an Allowed Secured Non-Tax Claim regardless |

25

| | | | |
|---|---|---|---|
| First Capital Finance, Inc. | 2 | $189,521.90 | of Class, deferred Cash payments from the Distribution Account in Quarterly Installments of $35,700.00 each*, commencing on the Distribution Date immediately following payment in full of Allowed Class 1 Claims, and on each subsequent Distribution Date thereafter until such holders of Class 2 through 15 Claims have received at least the Allowed amount of such Claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the Estate's interest in such Retained Parcels.  The holders of Allowed Secured Non-Tax Claims will receive interest on the Allowed amount of their Claim at the rate of 5.00% per annum.

*The Quarterly Installment is calculated to repay Allowed Secured Non-Tax Claims in full over 20 years from the Initial Distribution Date at 5.0% interest per annum.  The holders of Allowed Secured Non-Tax Claims who consent to the Debtor's contingent Working Capital Carve-Out will receive a balloon payment equal to the then outstanding balance of its Allowed Secured Claim on the 10th Anniversary of the Initial Distribution Date.  The Debtor will fund the balloon payment out of its future operations.  To the extent a holder of an Allowed Secured Non-Tax Claim does not consent to the Debtor's contingent Working Capital Carve-Out, the holder will receive a lien on the Reorganized Debtor's cash and accounts receivable junior only to the existing liens on such cash and accounts receivable.  In the event the Debtor's estate receives the entirety of the Insurance Proceeds, the Working Capital Carve-Out will not be sought by the Debtor. |
| Joseph J. & Isabel J. Prischak | 5 | $250,000.00 | |
| Joseph J. & Isabel J. Prischak | 11 | $574,089.31 | |
| Mercer County State Bank | 7 | $75,597.61 | |
| Quinn, Buseck, Lemhuis, Toohey & Kroto | 18 | $8,889.46 | |
| Summit Township | 4 | $2,794.66 | |
| US Foodservice | 14 | $20,218.21 | |

| | | | |
|---|---|---|---|
| Economic Progress Alliance of Crawford County | 16 | $150,000.00 | Holders of Allowed Secured DIP Lender Claims are unimpaired under the Plan.  The holders of Allowed Secured DIP Lender Claims shall share *Pro Rata* in the Net Available Sale Proceeds following payment in full of each holder of an Allowed Secured Non-Tax Claim in Classes 2 through 15. |
| Northwest Pennsylvania Regional Planning and Development Commission | 16 | $150,000.00 | To the extent the Net Available Sale Proceeds are insufficient to pay the holders of an Allowed Secured DIP Lender Claims in full, holders of such claims shall: (a) retain their liens on the Retained Parcels; and (b) receive on account of such Allowed Secured DIP Lender Claims deferred Cash payments consistent with the terms and conditions set forth in the Final DIP Loan Order. To the extent the Net Available Sale Proceeds are insufficient to pay the Allowed Secured DIP Lender Claims in full, the deficiency that remains due and payable to the holders of an Allowed Secured DIP Lender Claim shall be treated and paid as a Class 17 Allowed Priority Unsecured DIP Lender Claim. |
| **TOTAL** | | **$2,133,039.39** | |

4.    **Treatment of Secured Tax Claims**

### SECURED TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Summary of Proposed Treatment |
|---|---|---|---|
| Conneaut School District | 1 | $636,496.82 | Class 1 Allowed Secured Tax Claims are impaired under the Plan. The holders of Allowed Secured Tax Claims shall share *pro rata* in the following distributions: |
| Crawford County Tax Claim Bureau | 1 | $235,176.85 | (a) From the Insurance Proceeds for the Parcel ID 5513-001; and |
| Sadsbury Township | 1 | $12,211.20 | (b) From the proceeds of the sale of a Noncore Parcel, including the Flynn Property, after payment of Allowed Administrative Claims in amounts agreed upon or ordered pursuant to 11 U.S.C. § 506(c), until the Allowed Secured Tax Claims have been satisfied.

In the event the closing on the sale of the Flynn Property occurs before disbursement of the Insurance Proceeds, the portion of the sale proceeds payable on account of Allowed Secured Tax Claims shall be held in escrow until the Insurance Proceeds have been disbursed.

The holders of Allowed Secured Tax Claims also shall:
(a) retain their liens on the Retained Parcels; and
(b) share *Pro Rata* on account of such Allowed Secured Tax Claims deferred Cash payments from the Distribution Account in Quarterly Installments of $35,700.00 each, commencing on the first Distribution Date and continuing thereafter on each subsequent Distribution Date until such holders of Class 1 Claims have received at least the Allowed amount of such claim, with interest accruing postpetition at the rate of 9% per annum until paid in full, or in |

| Summit Township | 1 | $43,928.08 | such other amounts as agreed upon by the holders of Class 1 Claims.<br><br>It is anticipated that Class 1 Claims will be satisfied on or before the Initial Distribution Date from the Insurance Proceeds and the sale proceeds from the Flynn Property. |
|---|---|---|---|
| **TOTAL** | | **$927,812.95** | |

5.      **Treatment of Administrative Non-Tax Claims**

## ADMINISTRATIVE NON-TAX CLAIMS

| Name of Creditor* | Amount Owed through June 30, 2015 | Type of Debt | Summary of Proposed Treatment and Date of First Payment |
|---|---|---|---|
| Stonecipher Law Firm | $157,383.59 | Professional | $50,000 on the Effective Date of the Plan, plus application of balance of the retainer in the amount of $14,587.50 pursuant to an Order of Court authorizing payment, with the balance due and payable from the proceeds of the sale Noncore Parcels pursuant to 11 U.S.C. § 506(c) or available Insurance Proceeds. |
| Kreider and Company, LLC | $2,892.00 | Professional | In full on the Effective Date of the Plan to the extent not already paid in the ordinary course of business |
| Economic Progress Alliance of Crawford County | $104,435.65 | Trade | Reorganized Debtor will commence making monthly payments of $10,000 each starting in January 2017 on account its obligations owed to EPACC under the Management Agreement until all prepetition cure amounts and postpetition administrative claims have been paid. |
| **TOTAL:** | **$264,711.24** | | |

**6.      Treatment of Administrative Tax Claims**

N/A

**7.      Treatment of Priority Non-Tax**

N/A

**8.      Treatment of Priority Tax Claims**

### PRIORITY TAX CLAIMS

| Name of Creditor | Amount Owed | Type of Debt | Summary of Proposed Treatment and Date of First Payment |
|---|---|---|---|
| Sadsbury Township | $2,555.05 | 2014 Tax Obligation | Allowed Administrative Tax Claims will be amortized over a 60-month period and payable in equal quarterly installments commencing on the first Business Day of the first Calendar Quarter following the Effective Date of the Plan. |
| Summit Township | $12,966.46 | 2014 Tax Obligation | |
| Crawford County | $540.00 | 2014 Tax Obligation | |
| Conneaut School District | $20,003.27 | 2014 Tax Obligation | |
| **TOTAL** | **$36,064.78** | | |

\* To the extent the amounts due for 2014 have been liened and are included within the creditor's Class 1 Allowed Secured Tax Claim, it is a disputed Priority Tax Claim.

9.    **Treatment of General Unsecured Non-Tax Claims**

## GENERAL UNSECURED NON-TAX CLAIMS

| Creditor | Class | Total Amount Owed | Percent of Dividend |
|---|---|---|---|
| Acuren Inspection, Inc. | 18 | $499.00 | Unknown |
| Agresti & Agresti | 18 | $13,000.00 | Unknown |
| Albert Guarnieri | 18 | $8,593.09 | Unknown |
| Alliance Fire | 18 | $7,670.75 | Unknown |
| Allied Specialty Insurance, Inc. | 18 | $1,627.91 | Unknown |
| B.W. Electrical & Maintenance | 18 | $5,043.32 | Unknown |
| BMI General Licensing | 18 | $591.45 | Unknown |
| Classic Toy Company | 18 | $2,661.01 | Unknown |
| Coca-Cola | 18 | $6,714.05 | Unknown |
| Commonwealth of PA Liquor | 18 | $40.00 | Unknown |
| Crawford County Convention & Visitors | 18 | $725.00 | Unknown |
| Crawford County CVB | 18 | $1,355.00 | Unknown |
| Crawford County Juvenile Probation | 18 | $1,500.00 | Unknown |
| Darling International | 18 | $80.31 | Unknown |
| DeSantis Janitor Supply | 18 | $724.88 | Unknown |
| Dippin' Dots, LLC | 18 | $7,112.40 | Unknown |
| Economic Progress Alliance, Crawford Cty | 18 | $102,237.63 | Unknown |

| | | | |
|---|---|---|---|
| Fisher Fire Protection | 18 | $36,705.96 | Unknown |
| Forever Broadcasting | 18 | $8,667.60 | Unknown |
| Griffin Motors | 18 | $25,000.00 | Unknown |
| Hagan Business Machines | 18 | $4,789.16 | Unknown |
| Hammond Press | 18 | $750.00 | Unknown |
| Honey Hill Publishing, Inc. | 18 | $825.00 | Unknown |
| Industrial Truck & Crane, Inc. | 18 | $440.00 | Unknown |
| Industrial Welding | 18 | $5,742.35 | Unknown |
| J&J Candies | 18 | $1,254.90 | Unknown |
| J.R. Oxygen | 18 | $241.88 | Unknown |
| Jerauld L. Smith | 18 | $2,000.00 | Unknown |
| Jerilu Produce Company | 18 | $4,899.50 | Unknown |
| Jones Plumbing & Heating | 18 | $1,439.19 | Unknown |
| Kings Communications | 18 | $1,638.77 | Unknown |
| Kubinski Business Systems | 18 | $5,459.00 | Unknown |
| Lifco Hydraulics | 18 | $10,083.62 | Unknown |
| Lindsay & Hatheway, Attorneys at Law | 18 | $8,000.00 | Unknown |
| MAIC c/o Economic Progress Alliance | 18 | $24,279.56 | Unknown |
| McCormick Coffee Company | 18 | $921.00 | Unknown |
| McMahon & Associates, PC | 18 | $24,945.25 | Unknown |
| Michael J. Pierce Contracting | 18 | $9,495.50 | Unknown |

| | | | |
|---|---|---|---|
| National Fuel | 18 | $2,407.19 | Unknown |
| Northwest Planning Commission | 18 | $30,000.00 | Unknown |
| Penelec | 18 | $284,211.21 | Unknown |
| Pennsylvania Public Utility Commission | 18 | $1,000.00 | Unknown |
| Pepicelli, Youngs & Youngs, PC | 18 | $40,597.35 | Unknown |
| Pittsburgh Best Ice Cream, Inc. | 18 | $645.55 | Unknown |
| Pittsburgh Post-Gazette Credit Dept. | 18 | $1,007.60 | Unknown |
| Plaza Coin Laundry | 18 | $1,171.50 | Unknown |
| PNC Bank, N.A. | 18 | $45,681.70 | Unknown |
| Primo Distributors, Inc. | 18 | $4,596.47 | Unknown |
| Pymatuming Lake Association | 18 | $25.00 | Unknown |
| Redbone Products | 18 | $477.65 | Unknown |
| Shafer, Swick, Bailey & Irwin | 18 | $13,825.96 | Unknown |
| Starn Marketing Group | 18 | $50,927.76 | Unknown |
| Sysco Food Service | 18 | $2,374.65 | Unknown |
| T.H.E. Insurance Company | 18 | $300.00 | Unknown |
| T.I.G. Insurance Services | 18 | $16,674.23 | Unknown |
| Tinko Law Group | 18 | $2,593.70 | Unknown |
| Tribune Review Publishing | 18 | $1,510.25 | Unknown |
| Unifirst Corporation | 18 | $3,981.24 | Unknown |
| USF Holland | 18 | $1,256.60 | Unknown |

| | | | |
|---|---|---|---|
| Waste Management of PA, Inc. | 18 | $6,226.82 | Unknown |
| White Fire Extinguisher, Inc. | 18 | $848.00 | Unknown |
| William Jorden, Esquire | 18 | $32,000.00 | Unknown |
| Wilson Building Supply | 18 | $2,749.85 | Unknown |
| **TOTAL** | | **$884,844.32** | |

**10.     Treatment of General Unsecured Tax Claims**

N/A

**11.     Treatment of Equity Security Interests.**

The Debtor is a nonprofit corporation and has no Equity Holders.  The Debtor's Board of Trustees appointed in June 2014 and serving in a volunteer capacity without compensation shall continue to serve the Reorganized Debtor in such capacity and on the same terms.  The  members of the Debtor's Board of Trustees are:

William L. Bragg                    Mary Ann Martin
Thomas Cholak                      Joan Kozlowsky
Joseph C. Ledford                  Deborah P. Pipp

**12.     Will periodic payments be made to unsecured creditors?**   Yes

Class 18 Allowed Unsecured Claims, other than Priority Tax Claims, are impaired under the Plan.  Commencing on the first Business Day of October 2018, and ending on or before the Distribution Date that is seven (7) Calendar Quarters thereafter, the holders of Class 18 Claims shall share *Pro Rata* in deferred Quarterly Installments of Net Available Cash, if any, funded by the Reorganized Debtor's operations.

The Debtor estimates a total of between $50,000 and $100,000 will be distributed on account of Allowed Class 18 Claims between October 2018 and July 2020.  Based upon an estimated Allowed Class 18 Claim pool of approximately $900,000.00, the Debtor estimates a 5% to 10% dividend will be made on account of Allowed Class 18 Claims.  The Reorganized Debtor, however, does not guarantee the amount nor the timing of any Distribution to be made on account of Allowed Class 18 Claims.  Additionally, any default by the Reorganized Debtor in

34

payment of its DIP Loan obligations may result in a cessation of payments on account of Class 18 Allowed Unsecured Claims.

## V.      COMPARISON OF PLAN WITH CHAPTER 7 LIQUIDATION

If Debtor's Plan is not confirmed, the potential alternatives include proposal of a different plan (including the Taxing Authorities threatened Liquidating Plan), dismissal of the Bankruptcy Case or conversion of the case to Chapter 7.  If the Bankruptcy Case is converted to Chapter 7, a trustee will be appointed to liquidate the Debtor's non-exempt assets.  In this event, the Debtor's estate creditors do not realize the value of the Debtor's as a going concern or its future income from operations.  All allowed secured claims and priority claims, including all expenses of the Chapter 7 case and Chapter 11 case administration, must be paid in full out of the liquidation value of the estate's assets before any distribution is made to unsecured claimants.  As set forth below, the Debtor projects that a Chapter 7 liquidation would be insufficient to cover administrative expenses and would provide no distribution to holders of Allowed Class 18 Claims.

|  |  |
|---|---|
| Total value of Chapter 7 estate: | $2,722,637.88 |
| 1.  Less secured claims: | $3,060,852.34 |
| 2.  Less administrative expenses: | $264,711.24 |
| 3.  Estimated Chapter 7 expenses (calc. at 8%): | $161,003.83 |
| 4.  Less other priority claims: | $36,064.78 |
| Liquidation Value for Unsecureds: | ($799,993.97) |

Divided by total allowable unsecured claims of (See Section II C)          $ 884,844.32

Percentage of Dividend to Unsecured Creditors:                                **0.00%**

The holders of Allowed Class 18 Claims will fare better under the Plan than they would in a Chapter 7 liquidation.

This liquidation analysis assumes:  (1) that all of the Insurance Proceeds are provided to the Debtor's Estate; and (2) the charitable use restriction is lifted on the Noncore Parcels the Debtor seeks to sell through the Plan, with the exception of the value of the Hotel Conneaut and the Beach Club Site.

The value of a Chapter 7 liquidation could increase if the charitable use restriction is lifted for all of the Debtor's Real Property, depending on when and how the Real Property is sold.  The Local

35

Taxing Authorities have filed their Disclosure Statement accompanying their Liquidating Plan, which contains a liquidation analysis that assumes the charitable use restriction has been lifted from the entirety of the Debtor's Real Property.  It is the Debtor's contention that the charitable use restriction cannot be lifted over the objection of the Debtor and that lifting the charitable use restriction as to the remainder of the Debtor's Real Property does not increase the liquidation value of the Debtor's estate if the entirety of the Assets are exposed to the market at one time.[2]

## VI.   FEASIBILITY

**1.  Historical Operations**.

The Debtor's Monthly Operating Reports for this case have been filed timely and reflect the Debtor's Income Statement for the past 6 months. The Debtor, however, has a seasonal business open during late spring and summer.  Accordingly, the Monthly Profit and Loss Statements for May and June reflect operating performance during the peak time of the Debtor's operations.  *See* attached Exhibit I.

These Profit and Loss Statements, however, are not an accurate measure of feasibility for at least four (4) reasons.  First, there are substantial capital improvements made during the operating season ($28,429 in May and $37,000 in June).  These types of capital improvements are projected over the course of the next few years as a part of an intensive program to refurbish the Park.  They, however, would not be continuing ongoing expenses beyond the next few years.  Second, the Debtor is emerging from a history of troubled leadership, deferred maintenance, and difficult times.  Consequently, the income statements for the Debtor's historical operations do not reflect the revenue to be generated by the Debtor's future operations following the Debtor's capital improvements and expansion of its profitable business centers, including Camperland and the Hotel. Third, the proceeds from the sale of Noncore Parcels are available to fund the Plan, which proceeds are not contingent upon the profitable operations of the Debtor. Finally, the Debtor anticipates a substantial reduction in tax liability following both the sale of the Noncore Parcels and the assessment appeals filed on behalf of the Debtor and Reorganized Debtor seeking to exempt much of the Debtor's Real Property from local taxation.

**2.  Future Operations.**

Attached hereto as Exhibits II through VII are the Debtor's Cash Flow Projections

---

[2] For an alternative liquidation analysis that assumes the Debtor's property maybe sold free of the use restriction, please see the Taxing Authorities' Disclosure Statement.  By referring to the Taxing Authorities Disclosure Statement, the Debtor in no way endorses the liquidation value placed on the Debtor's Assets by the Local Taxing Authorities as accurate or feasible.

through 2020.   Based upon these projections, the Debtor acknowledges operational shortfalls are likely through calendar year 2016 in light of the capital improvements to be made to the Real Property and Park, but anticipates profitable operations to begin in 2017.

The Debtor's expenses for real estate tax liability will be substantially diminished by: (1) sale of certain Noncore Parcels; and (2) exemption from tax liability on certain Real Property as determined in subsequent assessment appeals to be filed and pursued by the Shafer Law Firm on behalf of the Debtor and the Reorganized Debtor.

**3.  Cash on the Effective Date funded with proceeds from the Debtors' DIP Loans:** $206,750.00

| | |
|---|---|
| $50,000.00 | Administrative Class |
| $0.00 | Taxes |
| $0.00 | Unsecured Creditors |
| $   TBD   | UST Fees |

**$TBD        TOTAL**

As set forth herein, the Reorganized Debtor will satisfy the remaining Allowed Administrative Claims from the proceeds of the sale of the Noncore Parcels in amounts agreed upon or ordered pursuant to Section 506(c) of the Bankruptcy Code.

**4.  Additional Disclosures.**

In response to the objections received by the Debtor and the Order of Court dated September 2, 2015 and entered at Document No. 197, the below narrative fleshes out more fully the assumptions made in the cash flow projections by articulating more clearly what assumptions are being made in light of the deviations between the projections and the actual postpetition performance by the Debtor.

A.     Critical Assumptions Affecting Future Viability and Profitability of the Reorganized Debtor

Creditors objecting to the Debtor's initial Disclosure Statement have questioned the viability of the Plan, which expresses confidence to affect a major financial and operational turnaround of Conneaut Lake Park.   This skepticism appears to be based primarily on the fact that Conneaut Lake Park has experienced annual operating deficits for almost two decades. Indeed the current level of non-tax debt associated with Conneaut Lake Park is almost entirely a result of the accumulation of annual operating

losses over a long period of time.

A number of obvious factors have combined to result in the accumulation of the current level of indebtedness including, most importantly, a long history of dysfunctional governance and management and the enabling environment created by creditors' extreme lack of diligence in requiring the timely satisfaction of the Debtor's obligations.

For many years during the past two decades, management of the Park was directly under the jurisdiction and protection of the Court of Common Pleas of Crawford County and directed by court appointed custodians with little if any experience in business management.  For more than 14 years, the Local Taxing Authorities and other public creditors took little if any action to collect unpaid taxes and fees, instead allowing the unpaid obligations to accumulate to levels well beyond the capacity of the Debtor to reasonably address without considering the conversion of restricted fixed assets to cash to satisfy its obligations (i.e. sale of Noncore Parcels).  During the past decade or so, management of the Park has generally been performed without compensation by volunteer members of the community serving as Trustees on the former Board of the Debtor. While certainly well-intended volunteers emotionally committed to the survival of Conneaut Lake Park, few if any had the management acumen and none had the resources necessary to effectively address the growing challenges resulting from the very significant accumulation of annual operating losses.

Upon the forced resignation of the Debtor's entire Board of Trustees in mid-2014 as a result of actions taken by the office of the Pennsylvania Attorney General, the Economic Progress Alliance of Crawford County and officials from the Attorney General's office collaborated to address long standing governance and management deficiencies in an attempt to finally place the Debtor on a path to sustainability.  As a direct result, a new seven member Board of Trustees was established and populated by highly experienced individuals with expertise in business management, financing, accounting and strategic planning.  A contractual management agreement was established between the newly installed Board of Trustees and the Economic Progress Alliance of Crawford County, thusly ending the long standing dependence on volunteers to manage the business affairs of the Debtor.  As EPACC is a public benefit-driven certified economic development organization (501(c)(6)), the basis for the management agreement with the Debtor is actual cost reimbursement and without profit to the EPACC.

To fully appreciate why the Debtor projects a high level of confidence in its capacity to succeed in the future in stark contrast to the past, it is critical to understand the depth of organizational commitment and expertise newly committed to the successful reorganization of Conneaut Lake Park.

a.      Key Personnel

1.      Mark Turner

Mark Turner serves as the Executive Director of the Economic Progress Alliance of Crawford County, Inc. (501(c)(6)) and its affiliated organization the Economic Alliance Foundation, Inc. (501(c)(3)).

Mr. Turner has been engaged in the practice of economic development for more than 37 years and has held the following leadership positions with not-for-profit organizations during his career:

•      President, Genesee County (NY) Chamber of Commerce
•      Executive Director, Genesee County Industrial Development Agency
•      Vice President, Buffalo (NY) Area Chamber of Commerce
•      Senior Vice President, Lancaster (PA) Chamber of Commerce and Industry
•      President, Economic Development Company of Lancaster County
•      Executive Director, Broome County (NY) Industrial Development Agency
•      Chairman, New York State Economic Development Council
•      President, Spokane (WA) Area Economic Development Council
•      Chairman, Washington State Economic Development Association
•      Chairman, Pacific Northwest Economic Development Council
•      Director, International Economic Development Council
•      Executive Director, Economic Progress Alliance of Crawford County
•      Executive Director, Economic Alliance Foundation

During his long career managing not-for-profit organizations, Mr. Turner has frequently been responsible for the reversal of organizational decline and has a 100% track record in the formation of high performing sustainable organizations. In virtually all positions held he has been successful in stabilizing and growing each of the organizations he has managed to unprecedented levels of financial success and mission attainment.

Mr. Turner has been instrumental in creating one of the largest self-sustaining private not-for-profit economic development organizations in the Commonwealth of PA with an annual operating budget of nearly $4,000,000 and assets of more than $48,000,000. He and his team of more than 30 employees have been responsible for directly rehabilitating more than 1.75 million square feet of formerly contaminated blighted facilities in Crawford County that now serve more than 50 industrial, commercial, nonprofit and governmental organizations combining to employ more than

2000 people in the community.

As Executive Director of the Debtor's management company, Mr. Turner is serving in a similar capacity, over-seeing the Debtor's operations and successful turnaround.

### 2.     Deana Burge

Ms. Burge is the EPACC's Deputy Executive Director and has served in this capacity for four years while holding increasingly responsible positions with the EPACC for more than 22 years.  Among her many responsibilities are personnel management, risk management, tenant relations and oversight of EPACC senior housing facilities.

### 3.     Randy Knuth

Mr. Randy Knuth serves as the EPACC's Director of Facilities and has held this position for more than 25 years. In this capacity Mr. Knuth is responsible for all facilities renovation, construction and maintenance and manages a staff of approximately 20 fulltime carpenters, electricians, plumbers and laborers.  Mr. Knuth is extremely well versed and equipped to address all aspects of facilities rehabilitation and property maintenance.

### 4.     Rich Ragen

With more than 27 years' experience, Rich Ragen serves as Controller for the EPACC and oversees all accounting functions including AP, AR, monthly reporting, audit preparation and tax returns.  His is ably supported by a staff of three fulltime staff accountants.

### 5.     Leonard Adams

Leonard Adams is new to the EPACC staff and is responsible for the safe and consistent operations of amusement rides at Conneaut Lake Park. Prior to joining the staff of the EPACC, Mr. Adams was the owner of Adams Amusements and has an extensive knowledge of vintage amusement park rides and operations gained over 17 years of experience. Mr. Adams is a certified amusement rides inspector and instructor and, in addition to his responsibilities to maintain and service Conneaut Lark Park amusement rides, serves as the Parks required resident inspector.

### b.     Explanation of Post-petition Losses

As reported on the July 2015 Monthly Operating Report, post-petition net income is approximately -$450,000.  As expected, upon the assumption of the responsibility to reorganize, revision and revitalize Conneaut Lake Park a concerted effort to address significant deferred maintenance, safety and blight removal became an absolute necessity prior to and during the 2015 operating season.  As a result it should be noted that $45,000 of reported losses are attributable to capital improvements; nonrecurring labor and materials costs associated with deferred maintenance are estimated at $77,035, and accumulated deferred professional services fees are $195,500.  When these factors are taken into account the actual post-petition operating losses through July are estimated to be $132,465.

Following is a summary of capital expenditures and nonrecurring maintenance tasks completed to date:

1.    Camperland:
      a.    Replaced office entry doors and façade to code
      b.    Replaced main entry fence
      c.    Installed new pond pumps and repaired water feature (activated for first time in four years)
      d.    Installed new asphalt main drive/entrance

2.    Amusement Park:
      a.    Installed new amusement rides signage throughout Park
      b.    Constructed and installed new Kiddieland restrooms
      c.    Reinforced / improved Pony Track building
      d.    Constructed and installed new Pony Track signage
      e.    Reconstructed Kiddieland electric storage cabinet (crayon box)
      f.    Separated Kiddieland power supply from Blue Streak (roller coaster) power supply
      g.    Installed new single phase motor and power supply for Little Dipper (roller coaster)
      h.    Constructed new Kiddieland Party Room
      i.    Remodeled existing Gift Shop
      j.    Replaced all mini-golf putting surfaces (carpet)
      k.    Restored mini-golf water feature

3.    Amusement Rides:
      a.    Purchased and installed new Blue Streak wheels
      b.    Reconstruction of Blue Streak Tunnel (on-going)
      c.    Reconditioned 12 bumper car motors (active cars increased

41

from 3 in 2014 to 12 in 2015)

    d.    Repaired and recommissioned Music Express – purchased and install vinyl center cover (activated ride – first time in three years).

    e.    Repaired train engine/transmission and recommissioned train (activated ride - first time in four years)

    f.    Purchased and installed new train wheels
Reconditioned, repaired and recommissioned Flying Shooter ride (activated ride – first time in two years)

    g.    Replaced Blue Streak boarding area truss

    h.    Replaced Blue Streak breaks

4.    Amphitheater:

    a.    Designed and constructed stage canopy structure

    b.    Installed new stage power supply

5.    Beach:

    a.    Clean-up and reclamation of former Beach Club site

    b.    Doubled size of public assess beach - installation of 500 tons of beach sand

    c.    Repaired and replace access steps to beach as required by insurance reviewer

6.    General:

    a.    Repaired and reactivated entrance feature fountain, replaced pump (operational for first time in four years)

    b.    Replaced CLP office porch roof

    c.    Prepared and painted steel fencing at main entrance to Park

    d.    Removed all dead trees, stumps and limbs throughout Park

    e.    Completed various necessary asphalt repairs throughout Park

    f.    Installed cat-5 cable to serve 5 register locations throughout Park – added debit acceptance capacity

    g.    Purchased and installed security cameras

    h.    Purchased and installed audio/music /PA system

    i.    Completed demolition of former "Fun House"

    j.    Competed demolition of private abandoned Park Ave. cottage

    k.    Relocated games building to concession court area

    l.    Renovated and relocated vendor concession building to concession court area for use by VooDoo Brewery

      m.        Removed all debris and obvious blight from site

      n.        Painted all CLP buildings – 13 in total

It is also important to recognize the losses suffered by the Debtor postpetition stem not only from the non-reoccurring capital expenditures that finally have been made to improve the Park, but also exist as a result of the prior management of the Debtor. The new Board of Trustees and EPACC's turnaround management did not come into being for the Park until the 2014 operating season was substantially concluded. 2015 represents the first full season in which the new Board and its management have had the opportunity to work upon the Debtor's operations. With the level of deferred maintenance and business difficulties present in June 2014, the operational profitability shown in Exhibit I at the end of August 2015 is remarkable.

Finally, the 2015 Comparison between the Debtor's projections for 2015 made in April of 2015 and actual results for the 2015 operating season show the Debtor exceeded projections in revenue by over 45% and underestimated projected expenses by only 16%. The underestimated expenses were due, primarily, to increased labor costs associated with the increased demand. *See* Omnibus Reply, Exhibit A, Document No. 237.

B.      <u>Basis for Future Projections</u>

Upon the assumption of responsibility for the management of Conneaut Lake Park, very little credible historical financial information was available to the new Board of Trustees. However, while the operating period under new governance and management has been short, detailed information and financials are now produced on a weekly basis that both inform and influence the projections for future operations.

a.      Exhibit I: 2015 Monthly Operating Statement

Exhibit I contained herein includes a monthly summary of actual and projected results from operations at Conneaut Lake Park during 2015. Financial statements included in the 2015 Monthly Operating Reports submitted to the Court have been adjusted to exclude capital expenditures and nonrecurring maintenance costs outlined in detail above.

While January through August report actual results, September through December include conservative estimates based on known contractual commitments and performance to date. While it would be most advantageous to have a longer period of operating history upon which to base future projections, 2015 results and the specific strategies identified in subsections (b) – (e) immediately below will produce incremental revenue in future years and serve to support the Debtor's contention that the Plan is

viable and that Conneaut Lake Park is now on a path to sustainability.

As the primary business of CLP is currently largely influenced by the seasonality of its operations, the first quarter of 2015 resulted in accumulative operating losses of $23,327.   Primarily as a result of pre-paid fees remitted by seasonal occupants of Camperland, actual results for April and May were positive and contributed to reducing accumulative losses to $8,740 at the end of May.

While June brought a considerable number of rain events affecting a reduction in revenue for the month, July revenues rebounded to nearly $130,000. However, because of poor June performance, accumulated losses at the end of July were $42,922.  Revenue from operations continued to grow and reached $167,488 for the month of August, and total accumulated losses were reduced to $19,262.

Based on actual performance to date and contractual bookings for September, October, November and December, it is expected that all 2015 operating losses will be eliminated and $39,489 in profits from operations will result for calendar year 2015.

b.   Exhibit II:  2015 Cash Flow Projections

Exhibit II is a revised 2015 projected cash flow statement that includes capital expenditures associated with improvements to the CLP Amphitheater, Camperland, public beach and preparations for recommissioning the CLP Waterpark and the expansion of Camperland in early 2016.  Please note that Exhibit II also includes the accrual of EPACC administrative expenses and proposes payment of $62,000 in Chapter 11-related Administrative Claims by year-end.

c.   Exhibit III:  2016 Cash Flow Projections

As summarized in Exhibit III, considerable efforts will be put forth during 2016 to establish a greater basis for revenue generation in 2016 and beyond.  Anticipated capital expenditures of $140,000 will result in the substantial expansion of Camperland and the Amphitheater, and the reactivation of an existing decommissioned Waterpark. In addition, a new indoor Go-Cart track will be added and operate year-round.  While Camperland expansion and Amphitheater improvements will support growth of existing revenue, the reactivation of the Waterpark and addition of the Go-Cart track will provide entirely new revenues streams to support the Park.

As also indicated in Exhibit III, 2016 is the year in which the Debtor proposes to sell the Flynn Property to satisfy the Allowed Secured Tax Claims in full, as well as the Class 1 Allowed Secured Non-Tax Claim.  Finally, it is the Debtor's intention to take

44

possession of Hotel Conneaut in the latter part of 2015. For the last several years, Hotel Conneaut has been a major non-performing asset of the Trustees of Conneaut Lake Park. After retaking possession of the Hotel Conneaut, the Reorganized Debtor projects revenue generation from the Hotel's operations commencing in 2016.

### d.  Exhibit IV:  2017 Cash Flow Projections

Exhibit IV provides the 2017 Cash Flow Projection.  In 2017, the Debtor projects additional sales of noncore property (Flynn Phase II), as well as incremental revenue and costs associated with a new anticipated Hotel lease and new income from Go-Cart, Waterpark and general increased operations.

Also projected for 2017 is the consummation of a revenue generating ground lease upon which a new Beach Club Restaurant will be privately constructed, and capital expenditures to include purchasing a new amusement ride and Midway improvements.

It is the intention of the Debtor to commence reimbursing EPACC during 2017 for administrative expenses deferred from 2015 and to commence debt service payments on Allowed Secured Claims to the extent not paid by the Insurance Proceeds or sale proceeds from the Noncore Parcels.

### e.  Exhibit V:  2018 Cash Flow Projections

As reflected in Exhibit V, in 2018, the Debtor intends to sell additional Noncore Parcels, defined in the Plan as the Reed Avenue and State 618 Parcels.  Of greatest significance, in 2018 the Debtor intends to aggressively assemble the financial resources necessary to begin planning the construction of a new year-round Performing Arts Center at the Park. Under the guidance of the EPACC, upon exiting chapter 11 proceedings, the Debtor will begin an effort to secure a grant of at least $1,000,000 from the Commonwealth of Pennsylvania to support the construction of a new and stunning Performing Arts Center.  The addition of the Performing Arts Center at Conneaut Lake Park, as well as a new Beach Club and year-round Hotel operations, will serve to "de-seasonalize" operations at the Park and contribute to its long term sustainability.

### f.  Exhibits VI and VII:  2019 and 2020 Cash Flow Projections

Exhibits VI and VII provide the Cash Flow Projections for 2019 and 2020, respectfully.  These show the completion of the new Performing Arts Center in 2019 and the capacity to amortize $1,000,000 in new debt associated with construction of the Performing Arts Center from the increased revenue generated by the Center itself and the Debtor's expanded operations over the previous four (4) years.

45

## VII.    <u>MANAGEMENT SALARIES</u>

| Position/Name of Person Holding Position | Salary at Time of Filing | Proposed Salary (Post-Confirmation) |
|---|---|---|
| Economic Progress Alliance of Crawford County, Pennsylvania | Hourly as set forth in the Management Agreement, capped at $10,000 per month | Hourly as set forth in the assumed Management Agreement, capped at $10,000 per month.  A copy of the Management Agreement is attached hereto as Schedule VII. |

## VIII.    <u>MATTERS AFFECTING PLAN PAYMENTS.</u>

### 1.    Litigation.

The Debtor is a party in the Insurance Litigation pursuant to which the Debtor has asserted an interest and right to payment of the Insurance Proceeds totaling $611,000. Park Restoration has asserted a competing claim to the Insurance Proceeds.  Further, the Local Taxing Authorities, assert a statutory right to payment of the Secured Tax Claims assessed against Parcel ID 5513-001.  A favorable judgment in the Insurance Litigation or any subsequent adversary action brought by the Reorganized Debtor against Park Restoration should provide immediate liquidity to the Reorganized Debtor and enable it make a substantial reduction in the amount of the Allowed Secured Tax Claims and Allowed Administrative Claims.  Accordingly, certain junior classes of Allowed Secured Claims will receive payment on a more expedited basis.

The Debtor has proposed this Plan on a conservative basis and without the benefit of the Insurance Proceeds.

### 2.    Disputed Claims

The Debtor disputes approximately $400,000 of claims asserted against it as Class 18 Claims, excluding the Harris Claim to which the Debtor attaches no value.  The Debtor also disputes a net difference of approximately $30,000 asserted against it as Secured Non-Tax Claims.  In the event the Reorganized Debtor is not successful in resolving the Disputed Claims in a favorable manner, the amount available for payment to holders of certain classes of Allowed Secured Non-Tax Claims may be reduced in

amount and deferred in timing and the amounts payable to holders of Allowed Class 18 Claims, if any, will be reduced in amount and deferred in timing.

## 3.    Operations

The Cash Flow Projections attached hereto as Exhibits II through VII are projections.  There is risk that the Reorganized Debtor's operations will not perform in accordance with the projections.  The Debtor's management has made conservative estimates for the Cash Flow Projections; however, certain contingencies can occur that are not reasonably foreseeable.

## 4.    The Charitable Use Restriction

Through its Plan, the Debtor seeks to sell its Noncore Parcels, which, by the Debtor's definition, includes only those parcels that are unnecessary for it to realize the charitable purpose for which it was created.  The Debtor, however, requires an order of court from the Bankruptcy Court authorizing the sale of the Noncore Parcels free and clear of the charitable use restriction.  The market value for a Noncore Parcel is substantially affected by the Debtor's capacity to sell the Noncore Parcels free and clear of the charitable use restriction.  Absent such authorization, the Debtor maintains that there is virtually no market for the asset and very little value to be realized by the Debtor's estate for the benefit of its creditors.

The Office of the Attorney General for the Commonwealth of Pennsylvania has indicated it will not object to the sale of the Flynn Property free and clear of the charitable use restriction, but has reserved its objections to the sale of the other two Noncore Parcels, the Reed Avenue Property and the State Rte 618 Property.  In an effort to resolve the threshold issue of the marketability of all Noncore Parcels free and clear of the charitable use restriction, the Debtor is seeking in the Confirmation Order for the Plan, the authority to sell all Noncore Parcels free and clear of the charitable use restrictions.  If the Debtor is not authorized to sell the Noncore Parcels free and clear of the charitable use restriction a major source of funding for the Debtor's reorganization is lost.

[THE REMAINDER OF PAGE IS INTENTIONALLY LEFT BLANK]

## IX.    CERTIFICATION

The undersigned hereby certifies that the information herein is true and correct to the best of my knowledge and belief formed after reasonable inquiry.

_____          _____
William L. Bragg                                           Date
Chairman of the Board of Trustees
Trustees of Conneaut Lake Park, Inc.
*Debtor-in-Possession*

_____          _____
George T. Snyder, Esquire                              Date
PA ID No. 53525
Jeanne S. Lofgren, Esquire
PA ID No. 89078
Stonecipher Law Firm
125 First Avenue
Pittsburgh, PA  15222
412-391-8510