**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | In Proceedings for a Reorganization |
| TRUSTEES OF CONNEAUT LAKE PARK, | ) | Under Chapter 11 |
| INC., | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | Case No. 14-11277-JAD |
| | ) | |
| ......................................................................... | ) | |

**THIRD AMENDED PLAN OF REORGANIZATION**
**DATED MARCH 31, 2016**

On December 4, 2014, a voluntary Petition under Chapter 11 of the Bankruptcy Code was filed by the Trustees of Conneaut Lake Park, Inc., the above-captioned debtor and debtor-in-possession (the "***Debtor***"). Pursuant to Section 1121 of the Bankruptcy Code, the Debtor proposes the following Amended Plan of Reorganization ("***Plan***") for approval by Creditors and other interested parties.[1]

**ARTICLE I**
**GENERAL FORMAT OF PLAN**

The Debtor is seeking to reorganize under Chapter 11 of the Bankruptcy Code. The Debtor is funding its reorganization and payment of its obligations under the Plan by: (a) selling the Noncore Parcels to the extent necessary; (b) making capital improvements to the Park and increasing revenues generated by the Park; (c) reducing the amount of Real Property subject to taxation by seeking and obtaining tax exempt status for certain parcels; and (d) utilizing the Insurance Proceeds or any recoveries the Debtor makes on account of the Park Restoration Obligations.

The Debtor anticipates that Allowed Secured Tax Claims will be satisfied from the Net Sale Proceeds from the Flynn Property which is projected to be sold in 2016 and 2017. To the extent Net Sale Proceeds exist following the sale of any Noncore Parcel, those proceeds will be distributed to holders of Allowed Secured Non-Tax Claims in accordance with their priority under applicable nonbankruptcy law.

In addition to the Net Sale Proceeds, the Debtor anticipates making Quarterly Installments of Cash to holders of Allowed Secured Non-Tax Claims commencing on the first business day in

---

[1] Unless otherwise stated, all section references contained herein are to the Bankruptcy Code in Title 11 of the United States Code.

April 2017.  The Quarterly Installments will be funded by the Reorganized Debtor's operations and will be distributed on a pro rata basis to holders of Allowed Secured Non-Tax Claims.  The amount of the Quarterly Installments payable to holders of Allowed Secured Non-Tax Claims is based upon amortizing $1,700,000 over 20 years at 6.00% interest per annum, with a balloon payment of all amounts then outstanding on account of Allowed Secured Non-Tax Claims to be due and payable on or around April 2027.

To the extent the Insurance Proceeds are fully awarded to the Debtor's estate, then up to $100,000 of the Insurance Proceeds following payment of the $478,260.75 to the Local Taxing Authorities will be distributed to holders of Allowed Secured Non-Tax Claims on a pro rata basis; provided that the holders of Allowed Secured Claims permit the Debtor's real property to be surcharged in order to pay down the Allowed Professional Claims in an amount mutually agreeable to the holders of the Allowed Professional Claims and the holders of Allowed Secured Claims who have not yet been paid in full.

In the event the Reorganized Debtor is unable to meet its financial obligations to the holders of Allowed Secured Claims as set forth in this Plan, the Debtor will commence liquidating additional Noncore Parcels beyond the Flynn Property, starting with the Hotel Conneaut.  In the event the sale proceeds from the Hotel Conneaut and the Reorganized Debtor's operations continue to be insufficient to satisfy the Reorganized Debtor's obligations under the Plan to the holders of Allowed Secured Non-Tax Claims, the Debtor then proposes to sell the Reed Avenue Property. The Net Sale Proceeds will be distributed to holders of Allowed Secured Claims and Administrative Claims in accordance with their priority under applicable nonbankruptcy law and consistent with the Plan.

Finally, the Plan provides for the Debtor to make Quarterly Installments of Net Available Cash, if any, to the holders of Allowed Unsecured Claims commencing on the first Business Day in October 2018 and continuing thereafter for seven (7) Calendar Quarters.

## ARTICLE II
## DEFINITIONS

Except as expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings assigned to them in this Article II of the Plan.  Any term used in the Plan that is not defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

For the purposes of this Plan, the following words or phrases have the meanings set forth below (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

    **2.1**    "**Administrative Claim**" means a Claim for costs and expenses of administration

that is allowable and entitled to priority under §§ 503, 507(a)(2) and/or 507(b) of the Bankruptcy Code, including, without limitation, any post-petition tax claims, any actual and necessary expenses of preserving the Estate, any actual and necessary expenses of operating the business of the Debtor, all Professional Claims, and any fees or charges assessed against the Estate of the Debtor under 28 U.S.C. § 1930.

**2.2**    "**Allowed Administrative Claim**" means an Administrative Claim which is Allowed.

**2.3**    "**Allowed**" or "**Allowed Claim**" or "**Allowed Interest**" when used with respect to, or to describe, a Claim against or Interest, means the outstanding balance on a Claim or Interest:

(a) which has been listed on the Debtor's Schedules, Disclosure Statement or the Plan as other than disputed, contingent or unliquidated and as to which no proof of Claim or objection has been timely filed;

(b) as to which a Proof of Claim has been timely filed, or deemed timely filed under applicable law or by reason of a Final Order, **AND**

(i) neither the Debtor nor any other party in interest entitled to do so has filed a timely objection to such Claim or Interest, or any motion to subordinate or otherwise limit recovery on the Claim or Interest has been made; or

(ii) if an objection to such Claim or Interest is filed, the Claim or Interest has been allowed (and only to the extent allowed) by a Final Order of the Bankruptcy Court; or

(c) which has been allowed under the provisions of this Plan.

**2.4**    "**Allowed Priority Claim**" means a Priority Claim that is Allowed.

**2.5**    "**Allowed Priority Unsecured DIP Lender Claim**" means a Priority Unsecured DIP Lender Claim that is Allowed.

**2.6**    "**Allowed Professional Claim**" means a Professional Claim that is Allowed pursuant to an Order of the Bankruptcy Court.

**2.7**    "**Allowed Secured DIP Lender Claim**" means a Secured DIP Lender Claim that is Allowed.

**2.8**    "**Allowed Secured Non-Tax Claim**" means a Secured Non-Tax Claim that is Allowed.

**2.9**    "**Allowed Secured Tax Claim**" means a Secured Tax Claim that is Allowed.

**2.10**   "**Allowed Unsecured Claim**" means an Unsecured Claim that is Allowed.

**2.11**   "**Assets**" means any and all property of the Debtor's estate of every kind and character, wherever located, whether real or personal, tangible or intangible.

**2.12**   "**Bankruptcy Code**" means Title 11 of the United States Code, as now in effect or hereinafter amended.

**2.13**   "**Bankruptcy Court**" means the United States Bankruptcy Court for the Western District of Pennsylvania, the Court having jurisdiction over this Case.

**2.14**   "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court applicable to this Case.

**2.15**   "**Beach Club Site**" means the land on which the former Beach Club lay situate and designated within the purple area on the Conneaut Lake Park Land Use Plan.

**2.16**   "**Business Day**" means any day that is not a Saturday, a Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a), or any other day on which banking institutions in Erie, Pennsylvania are required or authorized to close.

**2.17**   "**Case**" means the Chapter 11 case of In re Trustees of Conneaut Lake Park, Inc., at Bankruptcy Case No. 14-11277-JAD.

**2.18**   "**Cash**" means cash or cash equivalents, including but not limited to, wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

**2.19**   "**Calendar Quarter**" means each of the following three-month segments in a calendar year running from January 1st through December 31st: (i) January 1st through March 31st; (ii) April 1st through June 30th; (iii) July 1st through September 30th; and (iv) October 1st through December 31st.

**2.20**   "**Claim**" means a claim against the Debtor as defined in Section 101(5) of the Bankruptcy Code.

**2.21**   "**Claimant**" means the holder of a Claim.

**2.22**   "**Class**" means a class of Claims or Interests as set forth in Article IV of this Plan pursuant to Bankruptcy Code section 1122.

**2.23**   "**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order.

4

**2.24**   "**Confirmation Order**" means the Order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, as such order may be amended, modified or supplemented.

**2.25**   "**Conneaut Lake Park Land Use Plan**" means that certain map titled Conneaut Lake Park Land Use Plan and attached hereto as Schedule 2.25.

**2.26**   "**Cottage Lease**" means a lease of residential real property with the Debtor, or any predecessor-in-interest of the Debtor, as lessor, and concerning real estate located on or around the Debtor's Real Property.

**2.27**   "**Cottage Lessee**" means any person or entity that is a lessee under a Cottage Lease.

**2.28**   "**Cottage Owner**" means any person or entity that has acquired a fee simple interest from the Debtor, or a predecessor-in-interest of the Debtor, in the real property and the improvements thereon that had previously been subject to a Cottage Lease.

**2.29**   "**Creditor**" means "creditor" as defined in §101(10) of the Bankruptcy Code and shall refer to a person or entity that is the holder of a Claim that arose on or before the Petition Date or a Claim against the Debtor as defined in §102(2) Bankruptcy Code.

**2.30**   "**Debtor**" means the Trustees of Conneaut Lake Park, Inc.

**2.31**   "**DIP Lender**" means each and collectively, EPACC and The Commission in their capacity as debtor-in-possession lenders pursuant to the Final DIP Loan Order.

**2.32**   "**DIP Loans**" means those certain debtor-in-possession loans comprising the EPACC DIP Loan and The Commission DIP Loan authorized by the Bankruptcy Court pursuant to the DIP Loan Orders.

**2.33**   "**DIP Loan Orders**" means each and collectively, the Interim DIP Loan Order and the Final DIP Loan Order.

**2.34**   "**Disbursing Agent**" means the Reorganized Debtor, who shall receive and disburse all payments and distributions made pursuant to this Plan.

**2.35**   "**Disputed Claim**" means a Claim to the extent that:

(a)      a Proof of Claim was timely filed or is deemed filed under applicable law or by reason of a Final Order;

(b)      the Claim is, because of a pending objection or any other reason, not an Allowed Claim; **and**

(c)      the Claim has not been disallowed by a Final Order.  To the extent an objection seeks disallowance of part of a Claim, such Claim shall be a Disputed

Claim only to the extent of the objection.

**2.36** "**Distribution**" means property, including Cash, distributed as contemplated or provided for under the Plan: (i) by the Disbursing Agent; or (ii) at the closing of the sale of Noncore Parcel.

**2.37** "**Distribution Date**" means the first Business Day of each Calendar Quarter after the Initial Distribution Date until all amounts due and payable to the holders of Allowed Secured Claims have been paid in accordance with the terms of the Plan. All Distributions to be made under this Plan on the Distribution Date shall be made on, or, as funds become available, and as soon as practicable after the Distribution Date, in accordance with the provisions of the Plan.

**2.38** "**Effective Date**" means the first Business Day after the Confirmation Order becomes a Final Order and effective pursuant to Article 9.01 of the Plan.

**2.39** "**EPACC**" means the Economic Progress Alliance of Crawford County.

**2.40** "**EPACC DIP Loan**" means the portion of the DIP Loans funded by EPACC in the amount of $150,000.00 pursuant to the Interim DIP Loan Order and Final DIP Loan Order.

**2.41** "**Estate**" means the Estate created in this Case pursuant to §541 of the Bankruptcy Code.

**2.42** "**Final Decree**" means a Final Order of the Bankruptcy Court closing the Case pursuant to Rule 3022 of the Bankruptcy Rules.

**2.43** "**Final DIP Loan Order**" means that certain Order entered by the Bankruptcy Court on May 19, 2015 at Document No. 139 authorizing the DIP Loans on a final basis.

**2.44** "**Final Order**" means an Order or judgment of a court as entered on the docket which (i) shall not have been reversed, stayed, modified, or amended, and as to which the time to appeal from, or to seek review or rehearing of, shall have expired, and as to which no appeal or petition for review, rehearing or certiorari is pending, or (ii) if appealed from, shall have been affirmed (or the appeal dismissed) and the time to appeal from such affirmance or to seek review or rehearing thereof shall have expired, or no further hearing, appeal or petition for certiorari can be taken or granted. For the sake of clarity, a Final Order shall remain a Final Order despite the mere possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Final Order.

**2.45** "**Flynn Property**" means the Noncore Parcels comprising the Debtor's Real Property and identified in the Conneaut Lake Park Land Use Plan in light green as Number 1.

**2.46**   "**Hotel Conneaut**" means the Hotel Conneaut located at 12382 Center Street, Conneaut Lake, PA 16316 and a lot designated in purple in the Conneaut Lake Park Land Use Plan.

**2.47**   "**Initial Distribution Date**" means the first Business Day of April 2017.

**2.48**   "**Insurance Litigation**" means that certain Adversary Action pending at 15-01010-JAD in the Bankruptcy Court by and among Park Restoration as Plaintiff and the Debtor and each Local Taxing Authority as co-Defendants, and any related appeals.

**2.49**   "**Insurance Proceeds**" means the $611,000 interpleaded with the Bankruptcy Court, plus any accrued interest, in connection with the Insurance Litigation by Erie Insurance Exchange.

**2.50**   "**Interest**" means, with respect to the Debtor, any "equity security," as such term is defined in Bankruptcy Code §101(16).  Interests shall also include, without limitation, all ownership interests in the Debtor.

**2.51**   "**Interim DIP Loan Order**" means that certain Order entered by the Bankruptcy Court on May 11, 2015 at Document No. 123 authorizing the EPACC DIP Loan on an interim basis.

**2.52**   "**Local Taxing Authorities**" means each of the following and collectively:   (i) Conneaut School District; (ii) Crawford County; (iii) Sadsbury Township; and (iv) Summit Township.

**2.53**   "**Management Agreement**" means that certain Services Contract entered into between the Debtor and EPACC dated as of June 19, 2014 and listed on Debtor's Schedule G, as amended.

**2.54**   "**Net Available Cash**" means the balance of Cash generated by the Reorganized Debtor's operations after the Effective Date, if any, available for Distribution to holders of Allowed Class 18 Claims in accordance with the Plan that is net of the Reorganized Debtor's: (i) operating expenses; (ii) reasonable and necessary capital improvements expenditures; (iii) amounts reasonably necessary for the Reorganized Debtor's anticipated expenses and operations as determined in the reasonable discretion of EPACC and approved by the Reorganized Debtor; and (iv) debt-service obligations to holders of Allowed Claims under Classes 1 through 17 of the Plan and Administrative Claims.

**2.55**   "**Net Sale Proceeds**" means the balance of the proceeds from the sale of any Noncore Parcel net of: (i) closing costs and expenses of sale; and (ii) payment of Allowed Administrative Claims in amounts agreed upon or ordered pursuant to 11 U.S.C. § 506(c).

**2.56**   "**Noncore Parcel**" means, singularly and collectively, each parcel of Real Property that, in the Debtor's view, is not necessary for the Reorganized Debtor's core business operations or to realize the overall charitable purpose for which the Real Property was put

into charitable trust.  The Debtor has identified the Noncore Parcels in light green, bearing Numbers 1 through 4 in the Conneaut Lake Park Land Use Plan attached hereto as Schedule 2.25, as well as the Beach Club Site and Hotel Conneaut designated in purple in the Conneaut Lake Park Land Use Plan.

**2.57**    "**Order**" means an Order of the Bankruptcy Court in connection with the Debtor's Case.

**2.58**    "**Park**" means Conneaut Lake Park located at 12382 Center Street, Conneaut Lake, Pennsylvania 16316

**2.59**    "**Park Restoration**" means Park Restoration, LLC

**2.60**    "**Park Restoration Agreement**" means, singularly and collectively, each and every agreement, contract or lease between the Debtor or any predecessor-in-interest of the Debtor and Park Restoration, including but not limited to:  (i) those certain Beach Club Management Agreements dated 2008 and 2009; (ii) those certain Hotel Conneaut Lease Agreements dated 2008 and 2009; and (iii) that certain Commercial Lease Agreement dated November 24, 2008 concerning real property known as the "McClure Home" situate on State Route 618.

**2.61**    "**Park Restoration Obligations**" means collectively all amounts due and owing to the Debtor and its Estate by Park Restoration arising from or relating to the Park Restoration Agreements for, among other things, breach of contract and indemnification.

**2.62**    "**Petition Date**" means December 4, 2014, the date the Petition was filed in the Case.

**2.63**    "**Plan**" means this Plan of Reorganization filed by the Debtor, including any exhibits and appendices hereto, either in its present form or as it may be altered, amended, or modified from time to time.

**2.64**    "**Plan Distribution Account**" means the account established after the Effective Date by the Disbursing Agent for the purpose of facilitating certain Distributions to Creditors contemplated by the Plan.

**2.65**    "**Priority Claim**" means a Claim which is entitled to priority under §507(a) of the Bankruptcy Code, other than an Administrative Claim or Tax Claim.

**2.66**    "**Priority Tax Claim**" means a Priority Tax Claim held by a Local Taxing Authority as identified in Schedule 2.66 attached hereto and incorporated herein.

**2.67**    "**Priority Unsecured DIP Lender Claim**" means an Unsecured Claim held by the DIP Lenders entitled to priority pursuant to the Final DIP Loan Order.

**2.68** "**Professional Claims**" means the Administrative Claims for compensation for professional services and/or reimbursement of expenses pursuant to §§ 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the professionals retained in this case pursuant to an Order of Court.  Those professionals include, but are not limited to Stonecipher Law Firm as counsel to the Debtor, Shafer Law Firm as special counsel to the Debtor, and Porter Consulting Engineers, P.C., as engineering consultants.

**2.69** "**Pro Rata**" means proportionately so that with respect to an Allowed Claim within a particular identified Class or Classes, the ratio of:

(x) the dollar value of a particular type of property distributed at any time on account of such Allowed Claim to (y) the dollar amount of such Allowed Claim

 is the same as the ratio of

(A) the dollar value of all such property distributed on account of all Allowed Claims within such identified Class or Classes at such time to (B) the total dollar amount of all Allowed Claims within such identified Class or Classes at such time.

**2.70** "**Real Property**" means that certain real property owned by the Debtor and held in trust for use by the general public comprising 208.213 acres of land and the improvements thereon located in Crawford County, Pennsylvania.

**2.71** "**Reed Avenue Property**" means the Noncore Parcels comprising the Debtor's Real Property and identified in the Conneaut Lake Park Land Use Plan in light green with Number 3(s).

**2.72** "**Reorganized Debtor**" means the Debtor upon entry of the Confirmation Order.

**2.73** "**Retained Parcel**" means each parcel of the Debtor's Real Property retained by the Reorganized Debtor and not sold.

**2.74** "**Quarterly Installment**" means the installment payment made by the Disbursing Agent on any applicable Distribution Date.

**2.75** "**Secured Claim**" means (i) a Claim secured by a lien on assets of the Debtor which lien is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value of the creditor's interest in the Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined by the Bankruptcy Court pursuant to §§506(a), 553 and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, as applicable, or (ii) a Claim which is allowed under this Plan as a Secured Claim.

**2.76** "**Secured DIP Lender Claim**" means a Secured Claim that is not a Secured Tax Claim or a Secured Non-Tax Claim and is held by a DIP Lender.

**2.77** "<u>**Secured Non-Tax Claim**</u>" means a Secured Claim that is not a Secured Tax Claim or a Secured DIP Lender Claim and is held by a Claimant in Classes 2 through 15 of the Plan as identified in Schedule 2.77 attached hereto and incorporated herein.

**2.78** "<u>**Secured Tax Claim**</u>" means a Secured Claim held by a Local Taxing Authority and constituting a Class 1 Claim under the Plan as identified in Schedule 2.78 attached hereto and incorporated herein.

**2.79** "<u>**State Rte 618 Property**</u>" means the Noncore Parcels comprising the Debtor's Real Property and identified in the Conneaut Lake Park Land Use Plan in light green with Number 2(s).

**2.80** "<u>**The Commission**</u>" means the Northwest Pennsylvania Regional Planning and Development Commission.

**2.81** "<u>**The Commission DIP Loan**</u>" means the portion of the DIP Loans funded by The Commission in the amount of $150,000.00 pursuant to the Final DIP Loan Order.

**2.82** "<u>**Unclaimed Funds**</u>" means any distribution made after the Confirmation Date and pursuant to this Plan which is unclaimed after six (6) months.  Unclaimed Funds shall include (i) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (ii) funds for checks which have not been presented for payment, and (iii) checks (and funds represented thereby) which were not mailed or delivered because of the absence of a proper address to which to mail or deliver such property.

**2.83** "<u>**Unsecured Claim**</u>" means a Claim that is other than an Administrative Claim, a Priority Claim, a Professional Claim, or a Secured Claim.

**2.84** "<u>**Working Line of Credit**</u>" means that certain unsecured line of credit in the amount of $25,000 funded by EPACC to the Debtor and Reorganized Debtor to cover ordinary business expenses for Park Operations in 2016 and 2017 and to be repaid in the ordinary course of business from the Reorganized Debtor's operations.  The Working Line of Credit will be closed in November 2017.

### ARTICLE III
### <u>TREATMENT OF ADMINISTRATIVE AND PRIORITY CLAIMS</u>

**3.01** <u>**Administrative and Professional Claims.**</u>  All Allowed Administrative Claims, other than United States Trustee Fees, shall be paid by the Debtor, in full or in such amounts and on such other terms as may be agreed on between the holder of such Allowed Administrative Claim and the Debtor, or as otherwise ordered by the Court.  The Allowed Administrative Claims shall be funded primarily from: (a) proceeds from the sale of the Noncore Parcels, including the Flynn Property, in amounts agreed upon or ordered pursuant to 11 U.S.C. § 506(c); and (b) Reorganized Debtor's operations.

**3.02**    **United States Trustee Fees.**  All fees payable pursuant to 28 U.S.C. §1930 shall be paid in full in cash on or prior to the Effective Date of the Plan.

**3.03**    **Priority Tax Claims.** All Allowed Priority Tax Claims will be amortized over sixty (60) months and payable in equal Quarterly Installments commencing on the first Business Day of the first Calendar Quarter following the Effective Date of the Plan.

**ARTICLE IV**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

All claims and interests are divided into the following Classes:

**4.01**    **Class 1:**        Class 1 shall consist of Allowed Secured Tax Claims as set forth in Schedule 2.78 attached hereto.

**4.02**    **Classes 2-15:**  Classes 2-15 shall consist of the Allowed Secured Non-Tax Claims as identified on Schedule 2.77 attached hereto.

**4.03**    **Class 16:**      Class 16 shall consist of the Allowed Secured DIP Lender Claims.

**4.04**    **Class 17**:      Class 17 shall consist of the Allowed Priority Unsecured DIP Lender Claims.

**4.05**    **Class 18**:      Class 18 shall consist of Allowed Unsecured Claims.

**4.06**    **Class 19**:      Class 19 shall consist of Allowed Equity Interests.

**ARTICLE V**
**TREATMENT OF CLAIMS AND INTERESTS**

**5.01**    **Class 1: Allowed Secured Tax Claims.**

(a)    The holders of Allowed Secured Tax Claims shall share *pro rata* in the following distributions:

(i)    From the Insurance Proceeds for the Parcel ID 5513-001 up to $478,260.75; and

(ii)    From the Net Sale Proceeds of a Noncore Parcel, including the Flynn Property, until the Allowed Secured Tax Claims have been satisfied.

If the closing on the sale of a Flynn Property occurs before disbursement of the Insurance Proceeds, the portion of the Net Sale Proceeds payable on account of Allowed Secured Tax Claims shall be held in escrow until the Insurance Proceeds

have been disbursed to the Local Taxing Authorities, *but only* to the extent the Net Sale Proceeds reduce the amount outstanding under Class 1 to less than $478,260.75. By way of clarification, if application of the Net Sale Proceeds leaves a balance due and owing to holders of Allowed Class 1 Claims of more than $478,260.75, the Net Sale Proceeds shall be immediately disbursed to the holders of Allowed Secured Tax Claims and not subject to escrow. By way of further clarification, if the Insurance Proceeds are disbursed to the Local Taxing Authorities pending final resolution of the Insurance Litigation, the Net Sale Proceeds will be immediately disbursed to the Local Taxing Authorities regardless of the balance outstanding on the Class 1 Claim following application of the Net Sale Proceeds until the Class 1 Claims are paid in full.

(b)     The holders of Allowed Secured Tax Claims shall retain their liens on the Retained Parcels until paid in full. It is anticipated that Class 1 Claims will be satisfied on or before the Initial Distribution Date from the Insurance Proceeds and the Net Sale Proceeds from the Flynn Property.

Class 1 is Impaired.

**5.02**   **Classes 2-15:  Allowed Secured Non-Tax Claims.**

(a)     The holders of Allowed Secured Non-Tax Claims in Classes 2 through 15 shall receive Distributions from the Net Sale Proceeds, in accordance with their priority under applicable nonbankruptcy law following satisfaction of the Allowed Secured Tax Claims. Accordingly, the Net Sale Proceeds shall be disbursed first to the holder of the Class 2 Allowed Secured Non-Tax Claim until paid in full, then to the holder of the Class 3 Allowed Secured Non-Tax Claim until paid in full, then to the holder of the Class 4 Allowed Secured Non-Tax Claim until paid in full, and continuing on thereafter in numerical order until the holder of the Class 15 Allowed Secured Non-Tax Claim has been paid in full. *See* Schedule 2.77 for a list of the holders of the Allowed Secured Non-Tax Claims and their respective assigned Class.

(b)     To the extent the Net Sale Proceeds are insufficient to pay the holders of a Class of an Allowed Secured Non-Tax Claim in full, holders of such Allowed Secured Non-Tax Claims shall:

(i)     retain their liens on the Retained Parcels; and

(ii)    share *Pro Rata* with each holder of an Allowed Secured Non-Tax Claim regardless of Class, deferred Cash payments from the Distribution Account in Quarterly Installments of $30,000.00 each*, commencing on the Initial Distribution Date or on the Distribution Date immediately following payment in full of Allowed Class 1

Claims, whichever occurs later.  The Quarterly Installments will continue until the 10th anniversary of the Initial Distribution Date, at which time all amounts remaining due and payable to holders of Allowed Secured Non-Tax Claims will be paid in full.

*The amount of the Quarterly Installments is calculated to repay Allowed Secured Non-Tax Claims in full over 20 years from the Initial Distribution Date at 6.0% interest per annum with a balloon payment due on the 10th anniversary of the Initial Distribution Date.

(c)    To the extent the Insurance Proceeds are fully awarded to the Debtor's estate, then up to $100,000 of the Insurance Proceeds following payment of the $478,260.75 to the Local Taxing Authorities will be distributed to holders of Allowed Secured Non-Tax Claims on a pro rata basis; provided that the holders of Allowed Secured Claims permit the Debtor's real property to be surcharged in order to pay down the Allowed Professional Claims in an amount mutually agreeable to the holders of the Allowed Professional Claims and the holders of Allowed Secured Claims who have not yet been paid in full.

Each of Classes 2 through 15 are impaired.

**5.03    Class 16: Allowed Secured DIP Lender Claims.**

(a)    Class 16 Allowed Secured DIP Lender Claims are unimpaired under the Plan.  The holders of Allowed Secured DIP Lender Claims shall share *Pro Rata* in the Net Sale Proceeds following payment in full of each holder of an Allowed Secured Non-Tax Claim in Classes 2 through 15.

(b)    To the extent the Net Sale Proceeds are insufficient to pay the holders of an Allowed Secured DIP Lender Claims in full, holders of such claims shall:

(i)    retain their liens on the Retained Parcels; and
(ii)    receive on account of such Allowed Secured DIP Lender Claims deferred Cash payments consistent with the terms and conditions set forth in the Final DIP Loan Order.

(c)    To the extent the Net Sale Proceeds are insufficient to pay the Allowed Secured DIP Lender Claims in full, the deficiency that remains due and payable to the holders of an Allowed Secured DIP Lender Claim shall be treated and paid as a Class 17 Allowed Priority Unsecured DIP Lender Claim.

Class 16 is unimpaired.

**5.04**    **Class 17: Allowed Priority Unsecured DIP Lender Claims.**

Class 17 Allowed Priority Unsecured DIP Lender Claims are unimpaired under the Plan.  The holder of an Allowed Priority Unsecured DIP Lender Claim shall receive payment in full of its claim consistent with the terms of the Final DIP Loan Order prior to any Distribution on account of Class 18 Allowed Unsecured Claims; provided however, that so long as the Reorganized Debtor is not in default of under the terms of the DIP Loans, Reorganized Debtor may commence Distributions on account of Class 18 Claims.

Class 17 is unimpaired.

**5.05**    **Class 18 Allowed Unsecured Claims.**

Class 18 Allowed Unsecured Claims, other than Priority Tax Claims, are impaired under the Plan.  Commencing on the first Business Day of October 2018, and ending on or before the Distribution Date that is seven (7) Calendar Quarters thereafter, the holders of Class 18 Claims shall share *Pro Rata* in deferred Quarterly Installments of Net Available Cash, if any, funded by the Reorganized Debtor's operations.

The Debtor estimates a total of between $50,000 and $100,000 will be distributed on account of Allowed Class 18 Claims between October 2018 and July 2020. Based upon an estimated Allowed Class 18 Claim pool of approximately $900,000.00, the Debtor estimates a 5% to 10% dividend will be made on account of Allowed Class 18 Claims.  The Reorganized Debtor, however, does not guarantee the amount nor the timing of any Distribution to be made on account of Allowed Class 18 Claims.  Additionally, any default by the Reorganized Debtor in payment of its DIP Loan obligations may result in a cessation of payments on account of Class 18 Allowed Unsecured Claims.

**5.06**    **Class 19 Allowed Interests of Equity Holders.**

The Debtor is a nonprofit corporation and has no Equity Holders.  The Debtor's Board of Trustees appointed in June 2014 and serving in a volunteer capacity without compensation shall continue to serve the Reorganized Debtor in such capacity and on such terms; provided that, the Reorganized Debtor continues to be an operating entity serving the charitable purposes for which it was created.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**6.01**   **Rejected Executory Contracts and Unexpired Leases**.

(a)   Except as provided in §6.02, the Confirmation Order shall constitute an Order approving the rejection of all executory contracts and unexpired leases of the Debtor not previously assumed.  Such executory contracts and unexpired leases shall be deemed rejected effective as of the Effective Date.  All Claims arising out of such rejection must be filed with the Court, with a copy served upon Stonecipher Law Firm, 125 First Avenue, Pittsburgh, PA 15222, Attn: George T. Snyder, within thirty (30) days after the Effective Date.

(b)   By way of clarification, the Park Restoration Agreements have been terminated by the Debtor pursuant to applicable nonbankruptcy law for Park Restoration's failure to perform.  Accordingly, the Park Restoration Agreements are not subject to assumption or rejection by the Debtor's Estate.

**6.02**   To the extent not already provided by separate Order of Court, the Confirmation Order shall constitute an Order assuming the following executory contracts:

(a)   The Management Agreement between the Debtor and Economic Progress Alliance of Crawford for administrative and property management services with a ten (10) year term commencing on May 1, 2014 and terminating on April 30, 2024.

(b)   Bill's Midway Marina lease of docks and convention center for storage.

(c)   All Cottage Leases identified on the Debtor's Amended Schedule G at Document No. 149 to the extent (1) the Cottage Lease was not terminated prior to the Petition Date in a sale of a fee simple interest of the leased property to the Cottage Owner; and (2) the current Cottage Lessee elects not to purchase the property subject to the Cottage Lease from the Debtor in a sale pursuant to the Plan and section 1146(c) of the Bankruptcy Code.

**Note:  The Debtor reserves the right to supplement this list up to the Confirmation Date**.

## ARTICLE VII
## EXECUTION AND IMPLEMENTATION OF THE PLAN AND FUNDING OF PLAN DISTRIBUTION ACCOUNT

**7.01**    The Debtor is funding its reorganization and payment of its obligations under the Plan by:  (a) selling the Noncore Parcels to the extent necessary;  (b) making capital improvements to the Park and increasing revenues generated by the Park; (c) reducing the amount of Real Property subject to taxation by seeking and obtaining tax exempt status for certain parcels; and (d) utilizing the Insurance Proceeds or any recoveries the Debtor makes on account of the Park Restoration Obligations.

The Debtor has identified six (6) Noncore Parcels that could be subject to potential land sales in order to satisfy the Debtor's Plan obligations to holders of Allowed Secured Claims without causing a liquidation and closure of Conneaut Lake Park.  These parcels include:  (1) the Flynn Property, (2) the Reed Avenue Property, (3) the State Rte 618 Property; (4) property located west of State Rte 618; (5) the land where the Beach Club Site was located; and (6) the Hotel Conneaut.  While the Office of the Attorney General has stated it will not object to the sale of the Flynn Property free and clear of the charitable use restriction, it has reserved its objections as to the other identified parcels.

Upon identification of a prospective purchaser, the Debtor will seek to sell the identified Noncore Parcel free and clear of all liens, claims and encumbrances by filing a motion or motions with the Bankruptcy Court seeking approval of such sale free and clear pursuant to 11 U.S.C. Section 363.    The Debtor anticipates that it will substantially consummate the Plan upon the closing on the sales of the Flynn Property in 2016.  The Debtor has, however, provided for the Bankruptcy Court to retain jurisdiction over the subsequent sales of Noncore Parcels.

Notwithstanding the foregoing, the provisions of the Plan providing for the proposed sale of the Noncore Parcels free and clear of all claims and encumbrances is not intended to alter, by virtue of the entry of the Confirmation Order, any easement, right of way or other interest incident to the public water system operated by the Debtor ("***Water System***") and which is located on or impacts such Noncore Parcels.  Any such alteration of the easements, rights of way or other interests related to the Water System will be done consensually or through separate proceedings before the Court.  The right of the Pennsylvania Department of Environmental Protection to raise objections with respect to the Debtor's handling of the Water System is not altered by the Plan.

All payments to be made from the proceeds generated from the sale of a Noncore Parcel shall be distributed at the closing on the sale of the applicable Noncore Parcel.  All Quarterly Installments contemplated under the terms of this Plan shall be funded by:  (a) the Insurance Proceeds to the extent available; (b) any recoveries in connection with Park Restoration Obligations;  and (c) revenue generated in the Reorganized Debtor's operations.  All Quarterly Installments shall be made by the Disbursing Agent from the Plan Distribution Account.

**ARTICLE VIII**
**LITIGATION**

**8.01**   Litigation.

(a)   <u>Claims Reconciliation Litigation</u>.  Objections to the allowance of Claims may be filed.  Objections to Claims shall be filed and served the later of: (i) ninety (90) days after the Effective Date; or (ii) thirty (30) days after a Claim is timely filed with the Bankruptcy Court, including any Claim filed under §§ 6.01 or 6.02.  A Disputed Claim includes, but is not limited to, any Claim to which an Objection timely is filed.  A Disputed Claim shall not be entitled to receive any distribution under this Plan unless and until it becomes an Allowed Claim.

(b)   <u>Park Restoration Obligations</u>.  To the extent it becomes necessary, the Debtor may initiate a lawsuit against Park Restoration in connection with the Park Restoration Obligations for declaratory judgment that the Park Restoration Agreements are terminated and Park Restoration is dispossessed of any interest in the Real Property and/or to recover damages associated with the Park Restoration Obligations.

(c)   <u>The Insurance Litigation</u>.  As of the filing date of this Plan, the Insurance Litigation has not been resolved and cross-appeals of the Order of Court dated December 22, 2015 are pending.  In the event the Debtor obtains a judgment in its favor in the Insurance Litigation, $478,260.75 will be used to pay Allowed Secured Tax Claims, then up to $100,000 of the Insurance Proceeds will be distributed to holders of Allowed Secured Non-Tax Claims on a pro rata basis; <u>provided</u> <u>that</u> the holders of Allowed Secured Claims permit the Debtor's real property to be surcharged in order to pay down the Allowed Professional Claims in an amount mutually agreeable to the holders of the Allowed Professional Claims and the holders of Allowed Secured Claims who have not yet been paid in full.

(d)   <u>Charitable Use Restriction</u>.  The Office of Attorney General for the Commonwealth of Pennsylvania has stated it will not object to the sale of the Flynn Property free and clear of the charitable use restriction.  The Debtor, however, may seek to sell additional Noncore Parcels free and clear of the charitable use restriction to backstop the Reorganized Debtor's obligations under the Plan.  In the event the Pennsylvania Attorney General objects to the sale of any particular Noncore Parcel free and clear of the charitable use restriction, the Debtor anticipates that litigation resolving the extent and application of the *Cy Pres* Doctrine will be required.  The *Cy Pres* Doctrine authorizes assets placed into charitable trust to be transferred free of the charitable use restriction in limited circumstances.

## ARTICLE IX
## CONTINGENCIES TO THE EFFECTIVE DATE

**9.01**    The Plan will not be effective unless the Confirmation Order becomes a Final Order.

## ARTICLE X
## POST-CONFIRMATON MANAGEMENT OF THE DEBTOR

**10.01**   Upon entry of the Confirmation Order, the Debtor will continue to be managed by EPACC pursuant to the terms of the assumed Management Agreement.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**11.01   Retention of Jurisdiction**.  Subsequent to the Confirmation Order, the Bankruptcy Court shall retain jurisdiction of this Case for the following limited purposes:

(a)    To adjudicate all disputes concerning the allowance and classification of Claims, as well as any objections thereto, including the determination of matters under §§502 or 505 of the Bankruptcy Code relating to any tax claim against the Debtor;

(b)    To liquidate the amount of any disputed, contingent or unliquidated Claim;

(c)    To render final decisions on the allowance of all applications by professionals for fees and expenses in connection with the Case, whether earned before or after the Confirmation Date;

(d)    To construe or interpret any provision of this Plan and to issue such Orders as may be necessary for the implementation, execution, and consummation of the Plan to the extent authorized by the Bankruptcy Code;

(e)    To determine and render a Final Order on all motions, contested matters, and adversary proceedings arising out of this Case or in conjunction with this Plan, whether such matters have been filed prior to or after the Confirmation Date, including, but not limited to, motions to approve sales of assets, retention of brokers or agents, and adversary proceedings, or as may be filed under §8.01 herein;

(f)    To determine and/or render judgment and/or issue all such Orders as may be necessary to recover all assets and properties, wherever located, of the Debtor or its Estate;

(g)    To resolve all disputes and controversies that may arise in conjunction with the distribution of funds provided for in this Plan;

18

(h)    To make such determinations and enter such Orders as may be necessary to effectuate all the terms and conditions of the Plan, including the distribution of the funds and the payment of Claims and the capacity to sell Noncore Parcels free and clear of all claims, interests, and encumbrances, including any charitable use restrictions imposed on the Real Property; and

(i)    To make such determinations and enter such Orders as may be necessary with respect to the Claims and Interests of any party.

**11.02    Modification of the Plan**.  Debtor reserves the right in accordance with §1127 of the Bankruptcy Code to modify this Plan at any time before the Confirmation Date.  Debtor also reserves the right, subject to the requirements of §1127(b) of the Bankruptcy Code, to modify this Plan after the Confirmation Date.

**11.03    Reservation of Cramdown rights**.  In the event all Classes under the Plan do not accept the Plan in the requisite majorities, the Debtor reserves the right to move the Court to confirm the Plan notwithstanding the rejection of any Class, provided that at least one Class of Creditors whose Claims are impaired under the Plan have accepted the Plan.  In such event, the Court will determine whether the Plan can be confirmed notwithstanding rejection of the Plan by a Class of Creditors pursuant to §1129(b) of the Bankruptcy Code.

**11.04    Professionals**.  The retention of all professionals for the Debtor and the right of those professionals to compensation and reimbursement of expenses shall continue beyond the Confirmation Date, until the earlier of (a) further Order of Court or (b) the closing of the Case.

**11.05    Effect of Confirmation**.  Upon the entry of the Confirmation Order, except as otherwise provided in this Plan, (a) the provisions of the Plan shall be binding on the Debtor, all Creditors and all Interest holders, whether or not such person or entity has accepted the Plan and the rights of Creditors of the Debtor of any nature arising prior to the Confirmation Date will be limited to those arising under the Plan; (b) except as otherwise provided in this Plan, the property of the Estate shall revest in the Reorganized Debtor free and clear of all liens, claims, charges, security interests and/or interests of each Creditor whose Claim arose prior to the Confirmation Date; and (c) the Confirmation Order shall constitute a discharge of the Debtor pursuant to §1141 of the Bankruptcy Code.

**11.06    Release of Liability.**  The Confirmation Order shall as of the Effective Date act as a full and complete release and discharge by the Debtor, the Estate, all Creditors, and any other party in interest of:

(a)    the Debtor, its officers, its Board of Trustees, and the Estate,

(b)    Any Professional employed by the Debtor's Estate including Stonecipher Law Firm and Shafer Law Firm.  Engagement of Stonecipher Law Firm was approved by Order of Court dated January 6, 2015 and entered at Document No. 37.  Engagement of the Shafer Law Firm was approved by Court Order at

19

Document No. 175.

of any and all liability to any entity arising out of or related to any act taken or omitted to be taken in connection with or related to this Case other than in the instance of gross negligence or willful misconduct on the part of such party.

**11.07  Unclaimed Funds**.  Except with respect to property not distributed because it is being held in reserve pending the resolution of a Disputed Claim, Distributions that are not claimed by the expiration of 60 days from the respective Distribution Date shall be deemed to be unclaimed property under Section 347(b) of the Bankruptcy Code and shall vest or revest in the Estate, and the Claims with respect to which those Distributions are made shall be automatically canceled.  After the expiration of that 60 day period, the Claim of any entity to those Distributions shall be discharged and forever barred.  Nothing contained in the Plan shall require the Debtor to attempt to locate any holder of an Allowed Claim.  All funds or other property that vests or revests in the Estate pursuant to this Article shall belong to the Debtor.

**11.08  _Deminimus_ Distributions**.  The Disbursing Agent shall not be required to make Distributions to holders of Allowed Claims provided under this Plan if such Distribution will result in a payment amount of less than $100 unless: (a) a request for such Distribution is made in writing; or (b) such Distribution satisfies the balance due to a holder of an Allowed Claim.  The Disbursing Agent retains discretion to distribute or hold a _Deminimus_ Distribution for any particular Quarterly Installment that may otherwise be due to a holder of an Allowed Claim until such time as the aggregate, accumulated amounts of the unpaid Quarterly Installments exceed $100.00.

**11.09  Applicable Law**.  Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the Commonwealth of Pennsylvania.

**11.10  Headings**.  The headings of the Articles and the paragraphs of this Plan are for convenience only and shall not limit or otherwise affect the meaning thereof.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

## SIGNATURE PAGE OF PLAN OF REORGANIZATION

Dated: _____

Respectfully submitted,

TRUSTEES OF CONNEAUT LAKE PARK, INC.

By: _____
    William L. Bragg,
    Chairman of the Board of Trustees

STONECIPHER LAW FIRM

By: _____
    George T. Snyder, Esquire
    PA Attorney ID No. 53525
    gsnyder@stonecipherlaw.com
    Jeanne S. Lofgren, Esquire
    PA Attorney ID No. 89078
    jlofgren@stonecipherlaw.com
    125 First Avenue,
    Pittsburgh, PA 15222
    (412) 391-8510

Attorney for the Debtor

**SCHEDULE 2.25**

**Conneaut Lake Park Land Use Plan**

# CONNEAUT LAKE PARK
## LAND USE PLAN



CONNEAUT LAKE

**SCHEDULE 2.66**

**Priority Tax Claims**

| Creditor | Total Amount Owed | Disputed (D) Liquidated (L) Unliquidated (U) |
|---|---|---|
| Sadsbury Township | $2,555.05* | |
| Summit Township | $12,966.46* | |
| Crawford County | $540.00 | |
| Conneaut School District | $20,003.27 | |
| **TOTAL** | **$36,064.78** | |

\* These are amounts were scheduled by the Debtor.  The proof of claim filed by these taxing authorities did not include any amounts for priority tax claims.  To the extent the amounts due for 2014 have been liened and are included within the creditor's Class 1 Allowed Secured Tax Claim, it is a disputed Priority Tax Claim.

## SCHEDULE 2.77

## Secured Non-Tax Claims

| Creditor | Total Amount Owed | Class | Type of Collateral Priority of Lien (1, 2, 3) | Disputed (D) Liquidated (L) Unliquidated (U) | Will Liens Be Retained Under the Plan? (Y) or (N) |
|---|---|---|---|---|---|
| Berkheimer Associates | $40,329.95 | 3 | 3/17/1999 Judgment Lien – Real Property (Third Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $131,845.56 | 8 | 8/27/2004 Judgment Lien – Real Property (Eighth Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $339,550.44 | 6 | 3/7/2003 Mortgage and Mortgage & Security Agreement – Real and Personal Property (6th Lien Position | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $19,270.35 | 10 | 12/30/2004 Judgment Lien – Real Property (10th Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $47,798.70 | 13 | 2/8/2007 Judgment Lien – Real Property (13th Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $44,370.93 | 15 | 1/8/2009 Judgment Lien – Real Property (15th Lien Position) | Not Disputed | Y |
| Conneaut Lake Joint Municipal Authority | $23,238.86 | 9 | 10/2/2004 Judgment Lien – Real Property (9th Lien Position) | Not Disputed | Y |
| Donald G. Kaltenbaugh | $65,523.45 | 12 | 12/15/2006 Judgment Lien – Real Property (12th Lien Position) | Not Disputed | Y |
| First Capital Finance, Inc. | $189,521.90 | 2 | 1998 Judgment Lien – Real Property (2nd Lien Position) | Not Disputed | Y |
| Joseph J. & Isabel J. Prischak | $250,000.00 | 5 | 3/26/2002 Judgment Lien – Real Property (5th Lien Position) | Disputed | Y |
| Joseph J. & Isabel J. Prischak | $574,089.31 | 11 | 6/1/2006 Judgment Lien – Real Property (11th Lien Position) | Disputed | Y |

| Mercer County State Bank | $75,597.61 | 7 | 5/21/2004 Mortgage – Real Property (7th Lien Position) | Not Disputed | Y |
|---|---|---|---|---|---|
| Quinn, Buseck, Lemhuis, Toohey & Kroto | $8,889.46 | 18 | 1998 Judgment Lien that appears to have lapsed and been revived on November 16, 2014 and subject to lien avoidance as a preferential transfer | Disputed | No |
| **TOTAL** | **$1,810,026.52** | | | | |

2

**SCHEDULE 2.78**

**Secured Tax Claims**

| Creditor | Total Amount Owed | Class | Type of Collateral Priority of Lien (1, 2, 3) | Disputed (D) Liquidated (L) Unliquidated (U) | Will Liens Be Retained Under the Plan? (Y) or (N) |
|---|---|---|---|---|---|
| Conneaut School District | $636,496.82 | 1 | Municipal tax lien – Real Property (1st Lien Position) | Not Disputed | Y |
| Crawford County Tax Claim Bureau | $235,176.85 | 1 | Municipal tax lien – Real Property (1st Lien Position) | Not Disputed | Y |
| Sadsbury Township | $12,211.20 | 1 | Municipal Tax Lien – Real Property (1st Lien Position) | Not Disputed | Y |
| Summit Township | $43,928.08 | 1 | Municipal Tax Lien – Real property (1st Lien Position) | Not Disputed | Y |
| **TOTAL** | **$927,812.95** | | | | |